T.C. Memo. 2000-93

UNITED STATES TAX COURT

ROBERT T. AND KAY F. GOW, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25651-96.                    Filed March 20, 2000.

<u>Craig D. Bell</u> and <u>James C. Roberts</u>, for petitioners.

<u>William Henck</u> and <u>Timothy B. Heavner</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  In a notice of deficiency dated August 29,
1996, respondent determined the following deficiencies in, and
additions to, petitioners' Federal income taxes:

|       |            | Penalties            |              |
|-------|------------|----------------------|--------------|
| Year  | Deficiency | Sec. 6662(a)[1]      | Sec. 6663(a) |
| 1989  | $522,221   | $104,444             | $391,666     |
| 1990  | 334,663    | 66,933               | 250,997      |
| 1991  | 109,047    | 21,809               | 81,785       |
| 1992  | 103,224    | 20,645               | 77,418       |

[1] The sec. 6662(a) accuracy-related penalties were determined as an alternative to the sec. 6663(a) fraud penalties.

Subsequently, by an amendment to answer, respondent asserted increased deficiencies and penalties for 1989 and 1991, as follows:

|       |            | Penalties     |              |
|-------|------------|---------------|--------------|
| Year  | Deficiency | Sec. 6662(a)  | Sec. 6663(a) |
| 1989  | $877,054   | [1]           | $657,791     |
| 1991  | 153,214    | [1]           | 114,911      |

[1] 20 percent of the underpayment to which this section applies.

After concessions by each party, the issues remaining for decision are: (1) The value of shares of stock of Williamsburg Vacations, Inc. (WVI), awarded to Kay F. Gow (800 shares on February 16, 1989, and 400 shares on February 15, 1990) as bonuses; (2) whether WVI's payments of travel and entertainment expenditures for certain trips taken by petitioners constitute constructive dividends to them; (3) whether WVI's payments of expenditures for the procurement of an animal trophy collection constitute constructive dividends to petitioners; and (4) whether petitioners are liable for fraud penalties pursuant to section 6663(a), or in the alternative, accuracy-related penalties pursuant to section 6662(a).

All section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts, stipulations of settled issues, and attached exhibits are incorporated herein by this reference.

### Background

Petitioners, husband and wife, resided in Norfolk, Virginia, at the time they filed their petition.

Kay F. Gow (Dr. Gow) earned a doctor of education (Ed.D.) degree from Virginia Tech., specializing in business education. As part of her curriculum she took courses in accounting. Before 1983, she taught and supervised a business education program at a public high school in Virginia. At the time of trial, Robert T. Gow (Mr. Gow) was a retired civil service employee.

### Williamsburg Vacations, Inc. (WVI)

WVI was incorporated under the laws of Virginia on July 21, 1983. In November of 1986, WVI became a partner in a joint venture known as Powhatan Associates. (The other two members of the joint venture were Offsite International (Offsite) and Bush Construction Co. (Bush). None of the joint venturers were related; each held a one-third interest in Powhatan Associates.) During the years in issue, WVI's sole income-producing property was its indirect

interest in Powhatan Plantation, a time-share resort project of Powhatan Associates.

WVI was authorized to issue 50,000 shares of common stock. Initially, 650 shares of its stock were issued to Dr. Gow and 350 shares to Horace E. Henderson (Mr. Henderson). Dr. Gow exchanged previously acquired land located in North Carolina for her stock. Mr. Henderson exchanged his note with a face value of $192,230.[1]

The initial officers of WVI were: Mr. Henderson, president; Mr. Gow, executive vice president; Robert E. Lee, secretary; and E. Corbell Jones (Mr. Jones), treasurer. During the years in issue, Dr. Gow was president and chairman of the board of directors; Mr. Gow was the secretary and a director of the company.

On September 30, 1983, Dr. Gow sold 200 shares of her WVI stock to Mr. Jones and received in exchange Mr. Jones' agreement to cancel Mr. Gow's note in the amount of $119,000. As a condition of sale, Mr. Jones agreed that if during his lifetime he desired to dispose of all or any part of his 200 shares of WVI stock, Dr. Gow would have the right to repurchase the 200 shares, and upon Mr. Jones' death, his estate or successor in interest would sell Dr. Gow the 200 shares for $119,000, or $595 per share.

---

[1] Mr. Henderson defaulted on the payment of his note, and as a result, WVI instituted suit against him in the Circuit Court of Virginia Beach on Oct. 20, 1988. Mr. Henderson countersued, alleging violation of his shareholder rights and requested the dissolution of WVI.

Simultaneously with the sale of the 200 shares, Dr. Gow and Mr. Jones executed a voting trust agreement (VTA). Under the terms of the VTA, Dr. Gow and Mr. Jones agreed to, and did, transfer all of their shares in WVI to Mr. Gow, as trustee of the voting trust. The trust was to continue until September 30, 1993. On October 24, 1988, the VTA was amended. Pursuant to this amendment, Dr. Gow agreed to, and did, transfer all stock issued to her since September 30, 1983 (the date the VTA was executed) to Mr. Gow, as trustee. Moreover, Dr. Gow agreed to transfer to the trustee all stock subsequently issued to, or owned by, her.

On October 19, 1983, Dr. Gow, Mr. Henderson, and Mr. Jones signed an agreement to purchase a 256-acre tract of land located 1 mile west of the restored colonial area of Williamsburg, Virginia, known as Powhatan Plantation. (This property was acquired for development as a time-share resort. See infra.) On January 16, 1984, they assigned their rights in Powhatan Plantation to WVI.

By early 1984, WVI was in need of operating funds. In an attempt to provide working capital to WVI, Dr. Gow lent the company $120,000. WVI was unable to repay this loan, and on August 1, 1985, Dr. Gow accepted 50 shares of WVI's stock in satisfaction of the company's obligation to her.

On February 16, 1988, WVI's board of directors approved a stock bonus plan for Dr. Gow. Under the terms of the plan, Dr. Gow was entitled to receive as a bonus up to 10,000 shares of WVI

stock, at a maximum rate of 1,000 shares per year, for 10 years. The number of shares to be issued annually as a bonus was to be determined by Dr. Gow.

In accordance with the stock bonus plan, on February 16, 1989, WVI issued 800 shares of WVI common stock to Dr. Gow. On February 15, 1990, WVI issued an additional 400 shares of its common stock to her as a bonus. It is the value of these shares at the time of award that is subject to dispute--the first issue.

## Financing History

WVI borrowed $100,000 from Central Fidelity Bank. These funds were used to cover startup expenses and other administrative costs. In late 1983, WVI received an acquisition/development loan from First American Savings & Loan (First American) in the amount of $1.75 million; it also received a financing commitment from Berkeley Federal Savings (Berkeley) for $10 million.

In 1984, Bush began construction of, and Offsite marketed, the time-share project. In early 1985, Berkeley withdrew its loan commitment, making it difficult for WVI to timely meet its financial obligations to Bush for construction and to Offsite for marketing. WVI became delinquent in its payments to Bush, and in May 1985, Bush filed a mechanics lien against the project. The project further became mired in financial difficulties when, in early 1986, over its concern with Bush's mechanics lien, First American threatened to terminate its loan to WVI. Eventually,

Security Pacific (a local financial institution) agreed to provide development financing, as well as a bridge loan, to refinance the First American loan. Security Pacific conditioned its financing agreement on WVI's ability to reduce its outstanding debt. Consequently, in order to obtain debt forgiveness and secure additional guarantors, WVI proposed a joint venture with Bush and Offsite.

Powhatan Associates

On November 19, 1986, WVI, Bush, and Offsite formed Powhatan Associates. WVI contributed the development assets (which consisted of the Powhatan Plantation time-share project, land, unsold inventory, and contractual and other rights associated with the project net of project liabilities) as well as its services and expertise as a developer and administrator. Bush and Offsite each agreed to forgive the debt owed them by WVI; they further agreed to guarantee certain liabilities of WVI to repurchase defaulting time-share contracts under several financial agreements. Offsite agreed to continue to provide marketing services to the joint venture in exchange for an allocation of the fees and expenses relating to its marketing operations. Bush agreed to continue to provide construction services to Powhatan Plantation so long as it was allocated the profits and expenses associated with construction. The parties agreed that WVI would receive all of its administration costs (including reasonable salaries), plus 1-1/2 percent of the

gross proceeds after a certain level of development had been reached. This development fee was designed to equalize the estimated profit margins among Offsite, Bush, and WVI.

As the administrative partner of Powhatan Associates, WVI was responsible for the strategic planning and day-to-day operation of Powhatan Plantation. WVI's responsibilities included: (1) Reviewing and approving all time-share sales contracts; (2) obtaining financing for the joint venture; (3) preparing all required reports and accountings; (4) servicing and collecting joint venture mortgage portfolios; (5) monitoring product quality and customer satisfaction; and (6) coordinating the construction schedules and inventory availability.

Nonroutine matters required the approval of all three members of the joint venture.

The joint venture agreement contained restrictions on the transferability or sale of an interest in the joint venture. In pertinent part, it provided:

RESTRICTIONS ON TRANSFER

2.    Transfer of Venture Interest After Bona Fide Offer

(a)  Notice of Offer.  In the event * * * [Bush, WVI, or Offsite] desires to transfer all or some of its Venture Interest after receiving a bona fide offer from an independent third party, it must first:  (i) obtain the express prior written consent of all Venturers, or (ii) notify each of the other Venturers * * * in writing, of all of the relevant facts of the proposed transaction and its intention with respect to such Venture Interest or any right or interest therein * * * The * * * [nontransferring partner] shall have a right of first refusal to purchase the Subject Interest at a price and pursuant to the procedures and conditions set forth hereinafter.

(b)  Purchase Price.  The purchase price to be paid to the Transferring Venturer for the Subject Interest, if the Non-Transferring Venturer(s) exercise their rights of first refusal * * * shall be the price set forth in the Notice of Offer, or the appraised value; provided, that if the consideration to be paid by the proposed transferee is other than the payment of cash in full within thirty (30) days of the acceptance of the offer of the proposed transferee by the Transferring Venturer, the Joint Venture shall cause an independent appraiser * * * to establish the cash equivalent of such other consideration.

In 1997, the joint venture sold Powhatan Plantation and another time-share resort they owned to Signature Resorts, Inc., a publicly traded company now known as Suntera Resorts, Inc., for $59.1 million.

Powhatan Plantation Resort

Powhatan Plantation was part of an original land grant that was conveyed to a prominent colonial family in 1640. Located on the property is a manor house that was built circa 1735 and occupied by Mary Toliver. The manor house, as restored, was the centerpiece of Powhatan Plantation. On the 20 acres surrounding the manor house were formal gardens, numerous outbuildings, indoor and outdoor pools, athletic facilities, meeting rooms, and three food establishments, including a gourmet restaurant. The remaining 236 acres included open lands, a ring of woods, private roads, and the time-share condominiums and townhouses.

The Powhatan Plantation resort has a colonial working plantation theme. It was marketed as a luxury resort suitable for families to discover and explore the history of the surrounding area. The first sale of a time-share unit occurred in late 1984. As of February 1989, a total of 106 residential units had been sold; that number increased to 140 the following year.

The time-share program offered by Powhatan Associates conveyed either a 1/52 or a 1/104 undivided interest in an annual or biannual time-share estate. A purchaser of a time-share unit at Powhatan Plantation was entitled to the exclusive use and enjoyment of a unit during a designated and fixed week each year. The purchaser became a member of the Powhatan Plantation Owner's Association, which allowed the purchaser (or vacationer) to use

designated common and recreation areas, as well as the resources of Resorts Condominium International, a time-share exchange network.

Hawaii and Key West Trips

Petitioners believed that firsthand observation of other vacation resorts was necessary to maintain a competitive edge in the time-share industry. Between 1984 and 1992, on at least seven occasions, WVI's board of directors approved the expenditure of:

> such sums as are necessary in travel and entertainment to visit other luxury resorts and hotels in order to keep Powhatan Plantation competitive in product, services, and to remain knowledgeable about innovations in the resort industry and to seek new business opportunities and to engage in or sponsor retreats with political or business persons affecting the resort industry.

WVI bore all these expenses, with no commitment of reimbursement from Powhatan Associates.

Beginning in 1986, and continuing through the years in issue, petitioners made numerous trips to Hawaii and Key West, Florida. Most of these trips were taken around the Thanksgiving, Christmas, and New Year's holidays and often lasted between 2 and 3 weeks.

During these trips, petitioners conducted "interviews" with guests of the resorts, took tours of the resort facilities and premises, and examined the kitchen amenities and menus for compatibility with Powhatan Plantation. The purpose of the interviews and inspections was to gauge customer service and determine the level and efficiency of those services each resort

was providing. Petitioners rarely, if ever, spoke with the management of these resorts.

On a number of occasions, other members of the "WVI management team" accompanied petitioners on these trips. On at least one occasion each, David Legere (president of Offsite) and Senator Stanley Walker, along with their spouses, traveled with petitioners and had their expenses paid by WVI. On these trips, petitioners and their associates stayed at first-class resorts and dined at the finest restaurants. During their December 1990 trip to Hawaii, petitioners stayed at the Halekulani Hotel for $850 per night and dined at the La Mer restaurant for meals costing $900 or more; the next month they stayed at the Lodge at Koele for $900 per night and dined at expensive restaurants, with one meal costing over $2,000.

On these trips, petitioners enjoyed room service and many of the local attractions. Over the course of 4 days, petitioners incurred $462 in room service charges. During this same period, petitioners visited local tourist attractions such as Sea Life Park, Ala Moana shopping center, and the Waipio Valley historical site.

During the audit for the years in question (discussed infra), Dr. Gow was requested to provide itineraries for the trips to Hawaii and Key West. These itineraries, which purport to summarize petitioners' activities during those trips, were reconstructed by

Dr. Gow between 1993 and 1995, on the basis of invoices and "whatever records" petitioners maintained.

The total cost of travel, lodging, meals, and other related expenses WVI incurred for trips to Hawaii during the years in issue were as follows:

| Year | Expenditures |
|------|--------------|
| 1989 | $71,700 |
| 1990 | 67,454 |
| 1991 | 44,857 |
| 1992 | 83,929 |

WVI deducted these amounts, subject to the statutory limits on travel and entertainment expenses.

The total cost of travel, lodging, meals, and other related expenses WVI incurred for trips to Key West during the years in issue were as follows:

| Year | Expenditures |
|------|--------------|
| 1989 | $7,536 |
| 1990 | 14,256 |
| 1991 | 14,395 |
| 1992 | 11,281 |

WVI deducted these amounts, subject to the statutory limits on travel and entertainment expenses.

Procurement and Use of Animal Trophies

WVI incurred expenditures for travel, food, lodging, and professional guide fees in connection with the procurement of a world-class animal trophy collection (as well as taxidermy expenses) as follows:

| Year | Expenditures |
|------|--------------|
| 1989 | $130,376 |
| 1990 | 124,803 |
| 1991 | 242,498 |
| 1992 | 74,696 |

Under Dr. Gow's direction, Deborah Lee (Ms. Lee), WVI's controller and accountant, recorded these costs in the company's general ledger as an "expense" rather than in an asset account.

The animal trophy collection was to be used purportedly as a marketing strategy for the time-share project; namely, (1) as an amenity at Powhatan Plantation, and (2) as a traveling display to generate time-share leads at State and regional chapter meetings of the Safari Club and the National Rifle Association.

In order to acquire a world-class animal trophy collection, Mr. Gow hunted the animals in their natural habitat, mostly at the Y.O. Ranch. (Y.O. Ranch is a 500,000-acre tract of property located in Texas that housed over 60 species of imported African plains wildlife.) Mr. Gow also traveled to Alaska and other locations within the United States in search of exotic game such as moose, Armenian red sheep, sable, kudu, caribou, and elk. Mr. Gow employed hunting guides on these trips and usually took Dr. Gow

along because he "[enjoyed] spending time with her". Also accompanying Mr. Gow on the hunting trips were Louis Schreiner and his wife. (Mr. Schreiner was on the board of the Safari Club and owned the Y.O. Ranch.) Upon returning from these hunting excursions, Mr. Gow would hire a taxidermist to create the animal mounts.

The planned animal trophy museum to be located on Powhatan Plantation was never built. Nor was there ever a traveling display of the mounts. Rather, the animal mounts were displayed at both the Y.O. Ranch and Bob's Gun & Tackle Shop (Bob's) in Norfolk, Virginia. (A total of 31 animal mounts were displayed at Bob's and more than 31 others were displayed at the Y.O. Ranch.) Initially, the animal mounts at Bob's were identified with note cards bearing the name of Mr. Gow and certifying the animal mounts' world record status. Approximately a year later, and at the advice of their tax preparers, petitioners sent Bob's a letter indicating that the animal mounts were the property of Powhatan Plantation. Subsequently, the note cards were replaced with formal plaques bearing the name "Powhatan Plantation".

In 1991, Bob's placed 18 of the animal mounts in storage. In 1997, Signature Resorts, Inc., purchased all the assets of WVI, including the animal trophy collection.

In 1989, 1990, and 1992, WVI deducted all costs incurred for the procurement and display of the animal trophy collection, except

for $220 in 1990 and $1,760 in 1992, which were not deducted by virtue of travel and entertainment statutory limitations in effect for those years. In 1991, WVI capitalized $137,410 in animal trophy collection expenses and deducted $104,175. The remaining $913 was not deducted because of the travel and entertainment statutory limitations.

WVI's and Petitioners' Audits for 1989-92

In July 1991, Revenue Agent Richard Puchaty audited WVI's tax returns. Petitioners' tax returns were included in the audit after Revenue Agent Puchaty noticed an unusual pattern of recording expenses relating to the animal trophy collection across four different accounts in the company's general ledger. Revenue Agent Puchaty concluded that in light of continual mischaracterization of the animal trophy accounts throughout the company's ledger, as well as his difficulty in locating the animal trophy expenses entries, these expenses were intentionally being hidden. In an effort to clarify WVI's ledger system, Revenue Agent Puchaty sought an interview with both Dr. Gow and Ms. Lee; his request was denied.

Petitioners' 1989-92 Tax Returns

On their 1989 and 1990 returns, petitioners reported the values of the stock awarded to Dr. Gow as $40,000 and $20,000, respectively. They did not seek an expert valuation of the stock before reporting the aforementioned values on their tax returns. Petitioners reported no dividend income for 1989 and 1990, and

reported $420 and $2,094 of dividend income for 1991 and 1992, respectively. The dividend income reported for 1991 and 1992 was not attributable to any distributions from WVI.

Notice of Deficiency

In the notice of deficiency, respondent determined that the fair market value of the stock awarded to Dr. Gow on February 16, 1989, was $1,600,000, and the fair market value of the stock awarded to her on February 15, 1990, was $800,000. After the issuance of the notice of deficiency, respondent's valuation experts revalued the stock awards at $2,142,313 and $597,353 at their respective valuation dates.

Respondent also determined that petitioners received constructive dividends from WVI for 1989, 1990, 1991, and 1992 in the amounts of $305,072, $395,225, $341,521, and $323,281, respectively. By amendment to answer, respondent increased the amount for 1991 to $479,844. In his posttrial brief, respondent concedes that certain expenses paid by WVI in 1989-92 do not constitute constructive dividends to petitioners.

On the basis of respondent's redetermination of the values of the stock awards and the increase in the amount of the 1991 constructive dividend, the deficiencies asserted for 1989 and 1991 increased to $877,054 and $153,214, respectively.

OPINION

Issue 1.  The Fair Market Value of WVI's Common Stock

The first issue presented involves the valuation of shares of WVI's stock awarded to Dr. Gow as a bonus.  The parties agree that the value of these shares constitutes income to Dr. Gow.

The standard for valuation is fair market value, which is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973); Collins v. Commissioner, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo. 1992-478; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  This standard is objective, using a purely hypothetical willing buyer and willing seller, each of whom would seek to maximize his or her profit.  See Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Simplot v. Commissioner, 112 T.C. 130, 151-152 (1999); Estate of Mitchell v. Commissioner, T.C. Memo. 1997-461. The hypothetical buyer and seller are not specific individuals and their characteristics are not necessarily the same as the personal characteristics of an actual seller or a particular buyer.  See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, supra at 218. However, the hypothetical sale should not be construed in a factual

vacuum.  See <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 956 (1982).

The two WVI stock awards are from a private, closely held corporation.  There were no arm's-length sales of the stock before the date of the stock award.  Accordingly, we determine the value of the stock awarded indirectly by considering the following factors:

> "(a) The nature of the business and the history of the enterprise from its inception.
>
> (b)  The economic outlook in general and the condition and outlook of the specific industry in particular.
>
> (c)  The book value of the stock and the financial condition of the business.
>
> (d)  The earning capacity of the company.
>
> (e)  The dividend-paying capacity * * *.
>
> (f)  Whether or not the enterprise has goodwill or other intangible value.
>
> (g)  * * * the size of the block of stock to be valued. [and]
>
> (h)  The market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter."

<u>Estate of Simplot v. Commissioner</u>, <u>supra</u> at 153 (quoting Rev. Rul. 59-60, 1959-1 C.B. 237, 238).

Ultimately, valuation is a question of fact; all facts and circumstances are to be examined on the date of valuation without regard to hindsight.  See <u>Commissioner v. Scottish Am. Inv. Co.</u>,

323 U.S. 119, 123-125 (1994); Estate of Jung v. Commissioner, 101 T.C. 412, 423-424 (1993); Skripak v. Commissioner, 84 T.C. 285, 320 (1985). However, future events that are reasonably foreseeable at the valuation date may be considered in determining fair market value. See Estate of Newhouse v. Commissioner, supra at 218.

Both respondent and petitioners rely upon the report and testimony of their respective expert witnesses to establish the value of the shares of WVI's stock awarded to Dr. Gow. We weigh the expert's testimony in light of the expert's qualifications as well as other credible evidence. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Estate of Newhouse v. Commissioner, supra at 217. We are not bound by the opinion of any expert witness; we may reach a decision as to the value of property based upon our own analysis of all the evidence in the record, see Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285, using all of one party's expert analysis, or selectively using any portion of either analysis, see Estate of Simplot v. Commissioner, supra at 155; Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). Additionally, we may derive the fair market value of property from within a permissible range of values that may be arrived at from consideration of all the evidence. See Silverman v. Commissioner, supra; Estate of Simplot v. Commissioner, supra.

A.  Valuation by Petitioners' Expert

Petitioners' expert, Peter Gampel (Mr. Gampel), is the director of the Florida and Caribbean valuation services group of Arthur Andersen & Co.  In determining the value of the shares of WVI stock awarded to Dr. Gow (800 shares on February 16, 1989, and 400 shares on February 15, 1990), Mr. Gampel first valued WVI's one-third interest in Powhatan Associates, and then adjusted the book values of WVI's assets to their fair market values to determine the equity value of WVI as of the applicable valuation date.  Next, Mr. Gampel applied discounts to the shares of stock awarded to Dr. Gow to reflect lack of control and lack of marketability.  Mr. Gampel ultimately arrived at a value of $685,000 for the 800 shares of WVI stock awarded to Dr. Gow on February 16, 1989, and $299,000 for the 400 shares awarded to Dr. Gow on February 15, 1990.

In valuing WVI's interest in Powhatan Associates, Mr. Gampel first determined the aggregate value of Powhatan Associates as of February 16, 1989, and February 15, 1990, and in doing so he used the income approach, adopting the discounted cash-flow method. The discounted cash-flow method is based upon the premise that a business is worth the present value of all future benefits it will produce for its owner(s), with each expected future benefit discounted at a rate that reflects the risk that those benefits will not be realized.  The discount rate selected is generally

based on rates of return available (as of the valuation date) from alternative investments of similar type and quality. Application of this method requires forecasting future benefits from the ownership of the operations as well as future investments required to maintain the level of benefits.

Mr. Gampel determined Powhatan Associates' anticipated income stream by (1) projecting the number of time-share intervals sold as of the respective valuation dates, and (2) estimating the sale price for those intervals. He projected the number of intervals sold by averaging the interval sales for the 2-year period preceding each valuation date. (The interval sales were 1,408 for 1987, 1,754 for 1988, and 1,749 for 1989.) Next, he divided total sales by intervals sold for each of 1987, 1988, and 1989 in order to arrive at the average interval price for each year. By using this methodology, Mr. Gampel determined the average interval price to be $11,400 for 1987, $13,100 for 1988, and $13,300 for 1989, and the average interval price for the 1987-88 period to be $12,250, and for the 1988-89 period to be $13,200.

Mr. Gampel then considered cost of sales for the intervals, taking into account construction costs, project amenities, sales commissions, and the development fee payable by Powhatan Associates to WVI. He estimated cost of sales to be 71 percent for the 1989 valuation date and 69 percent for the 1990 valuation date. In making this determination, Mr. Gampel considered interest income,

interest expense, income taxes, administration costs, and amortization for financing commitments. After estimating Powhatan Associates' net income for both valuation dates, in order to arrive at Powhatan Associates' estimated annual cash-flow stream, Mr. Gampel considered noncash charges, capital expenditures, changes in net working capital, and debt.

Next, Mr. Gampel developed a discount rate through the summation method that combined:

| | |
|---|---|
| a risk-free rate of return of | 8.93% |
| a market risk premium of | 3.97 |
| a small stock risk premium of | 9.02 |
| a company specific risk premium of | 10.0 |
| Total | 31.92 |
| Rounded | 32.0 |

The 32-percent discount rate was then applied to Powhatan Associates' estimated cash-flow stream for both valuation dates.

On the basis of his discounted cash-flow analysis, Mr. Gampel opined that (1) the fair market value of Powhatan Associates was approximately $11.7 million as of February 16, 1989, and $14 million as of February 15, 1990; and (2) WVI's one-third interest in Powhatan Associates (before discounts to reflect lack of control and lack of marketability) was approximately $3.9 million as of February 16, 1989, and $4.7 million as of February 15, 1990.

Mr. Gampel reduced the value of WVI's one-third interest in Powhatan Associates by two discounts: A minority interest (or lack of control) discount and a lack of marketability discount. These

discounts were applied separately.  After examining data on control premium studies, Mr. Gampel concluded that a 15-percent minority interest discount was appropriate for both valuation dates.  In addition, Mr. Gampel concluded that a 30-percent lack of marketability discount for both valuation dates was appropriate on the basis of the following factors: The lack of "special purchasers" in the time-share industry, the restrictive nature of the buy-sell provision in the joint venture agreement, the overall restrictions placed on transferability of the joint venture's interest, and the size and composition of each partner's one-third interest.  Accordingly, after applying discounts to reflect lack of control and lack of marketability, Mr. Gampel opined that the value of WVI's one-third interest in Powhatan Associates was $2,321,690 as of February 16, 1989, and $2,770,320 as of February 15, 1990.

After determining the value of WVI's one-third interest in Powhatan Associates, Mr. Gampel adjusted the book value of WVI's other assets to fair market value as of February 16, 1989, and February 15, 1990.  After making these adjustments, Mr. Gampel determined that WVI's adjusted book value was $3,328,707 as of February 16, 1989, and $4,040,947 as of February 15, 1990.  To these values, Mr. Gampel applied a 15-percent contingency discount that further reduced the adjusted book values of WVI to $2,829,401 as of February 16, 1989, and $3,434,805 as of February 15, 1990.

Mr. Gampel's final step in valuing the stock bonuses was to apply a second level (at the WVI level) of minority interest and lack of marketability discounts. Mr. Gampel believed that for the February 16, 1989, stock issuance, a 20-percent minority interest discount and a 30-percent lack of marketability discount were appropriate. For the February 15, 1990, stock issuance, Mr. Gampel believed that a 30-percent minority interest discount and a 30-percent lack of marketability discount were appropriate. In determining the extent of the minority interest discount, Mr. Gampel considered the following factors: (1) The size of the stock issuance (800 and 400 shares), which represents only a minority interest in WVI; (2) the existence of the VTA at both valuation dates; (3) a lack of "swing vote" characteristics in each stock issuance; (4) a lack of "special purchasers" in the marketplace; (5) WVI's historical reluctance to distribute dividends; (6) the terms of the buy-sale agreement and other restrictions on the transferability of WVI's stock; (7) the lack of recent sales of similar interests in WVI; and (8) the existence of the ongoing litigation. In determining the marketability discount, Mr. Gampel reviewed a number of empirical studies that were performed in an effort to quantify average levels of discounts for lack of marketability in the marketplace and considered the following factors: (1) The lack of an organized market for the purchasing/selling of interests; (2) lack of sales of similar

interests; (3) the remoteness of a sale of Powhatan Associates; and (4) the probability of an event giving rise to a dispute among the venturers.

By applying these discounts, Mr. Gampel concluded that the fair market value of the stock bonus to Dr. Gow was $685,000 ($856.25 per share) on February 16, 1989, and $299,000 ($747.50 per share) on February 15, 1990.

B. Valuation by Respondent's Experts

Respondent relied upon two expert witnesses: Diane Maiden (Ms. Maiden) and Deborah Kalmar (Ms. Kalmar), both of whom are employed full time by the Internal Revenue Service. Ms. Maiden, a real estate appraiser, valued Powhatan Associates' inventory of time-share intervals and the land yet to be developed as time-share property.[2] Ms. Kalmar, a business valuation expert, used Ms. Maiden's valuations to complete respondent's valuation of the stock bonuses awarded to Dr. Gow.

Ms. Maiden valued the income-producing property of Powhatan Plantation using the discounted cash-flow method because of the

---

[2] On Feb. 16, 1989, the project was in phase III of its planned development, with approximately 50 acres (146 units) of the 256-acre site devoted to the project. By Feb. 15, 1990, 65 acres (196 units) had been devoted to the project. According to the zoning and final site plan, approved by the James City County Board of Supervisors in April 1984, only 500 residential units could be built on the 256 acres. Therefore, in 1989, 206 acres remained to be developed with a maximum of 354 residences and in 1990, 191 acres remained which could be developed with 304 residences.

income-producing nature of the property.  To project the number of time-share sales, she relied on Powhatan Associates' annual reports to the Virginia Department of Professional and Occupational Regulation's real estate board, the public offering statement for the project, and computer printouts of 1989 and 1990 sales provided by petitioners.  Ms. Maiden determined that potentially 500 units could be built, and after taking into account the number (5,497) of intervals which had been sold as of February 16, 1989, 20,003 intervals remained for sale.[3]  She projected annual sales of 1,800 intervals for 1989 and 1,900 intervals for each of the subsequent years until the total number of intervals (20,003) that remained to be sold as of February 1989 was sold.  To determine a weighted average interval sales price, Ms. Maiden used the audited financial statements of Powhatan Associates and a price list for sale in 1997 (the only existing price list), in addition to the information used to project the number of time-share units sold.  On the basis of this information, Ms. Maiden determined a weighted average sale price of $14,000 for all years in the projection period.  The net operating income per interval was then estimated, using Powhatan

---

[3]     In calculating the number of intervals which could be sold, both experts used 51 intervals per unit.

Associates' financial statements and Powhatan Associates' marketing and construction agreements, as follows:

| Average interval sales price: | $14,000 |
| --- | --- |
| Expenses: | |
| Sales/marketing | 45.0 |
| Cost of construction | 25.0 |
| Development fees | 1.5 |
| Reserves for amenities | 1.5 |
| Total | 73.0 |

Net operating income per interval        $3,780
($14,000 - (73% x 14,000 = $10,220))

On the basis of the assumptions that (1) as of February 1989, 20,003 intervals remained for sale, (2) 1,800 of the 20,003 intervals would be sold in year 1, 1,900 of the intervals would be sold in each of the years 2-10, and 1,103 intervals would be sold in year 11, and (3) the net operating income per interval would be $3,780, Ms. Maiden calculated the income stream that could be generated from the sale of Powhatan Plantation's time-share properties to be $75,611,340 for 1989 and $69,586,020 for 1990.

Ms. Maiden then considered the proper discount rate to be used to bring the estimated future income stream to present value. Ultimately, Ms. Maiden determined that a 25-percent discount rate was appropriate, using "the band of investment" method, which is a "synthesis of mortgage and equity * * * [yield] rates, which market data discloses as applicable to comparable properties". The method selected is "a weighted average of rates of return by the lender and equity investor". In arriving at the 25-percent discount rate,

Ms. Maiden combined the safe rate of return from the 10-year U.S. Treasury bond (9.17 percent and 8.47 percent on the two valuation dates) and the equity rate expected by land and real estate developers (between 15 and 30 percent). Believing that the risk and lack of liquidity inherent in the time-share industry increases the discount rate, Ms. Maiden selected the higher end of the range.

Use of the 25-percent discount rate resulted in Powhatan Associates' inventory of time-share intervals and the land yet to be developed having a fair market value of $28,732,000 as of February 16, 1989, and $28,402,000 as of February 15, 1990.

Respondent's experts adjusted (increased) Powhatan Associates' yearend audited balance sheet to reflect the fair market values of the inventory and land. Using the first-in first-out (FIFO) method of inventory, they determined the division between inventory and land fair market values to be as follows:

2/16/89 Inventory on hand--1,949 intervals

|  | Number | (Rounded) Net Value | Discounted Value (25%) |
|---|---|---|---|
| Sales (projected) | 1,800 | $3,381 | $6,085,498 |
| Remaining inventory | 149 | 2,705 | 403,045 |
| Value allocated to inventory of intervals | 1,949 |  | 6,488,543 |
| Total FMV |  |  | 28,732,000 |
| Value allocated to land |  |  | 22,243,457 |

2/15/90 Inventory on hand--2,905 intervals

|  | Number | (Rounded) Net Value | Discounted Value (25%) |
|---|---|---|---|
| Sales (projected) | 1,900 | $3,381 | $6,423,581 |
| Remaining inventory | 1,005 | 2,705 | 2,718,525 |
| Value allocated to inventory of intervals | 2,905 |  | 9,142,106 |
| Total FMV |  |  | 28,402,000 |
| Value allocated to land |  |  | 19,259,894 |

Powhatan Associates' balance sheet line items (other than inventory and land devoted to time-share development) were interpolated from the close of the end of the prior year to the applicable valuation date (at a straight-line rate) to reflect the time difference.[4] (No provision for taxes was included in determining the overall value of Powhatan Associates on the basis that no tax is paid at the joint venture level.) After making these adjustments, respondent's experts concluded that (1) the venturers' equity in Powhatan Associates was $32,866,718 as of February 16, 1989, and $35,001,760 as of February 15, 1990, and (2) WVI's one-third pro rata interest in Powhatan Associates (before discounts to reflect lack of control and lack of marketability) was $10,955,573 as of February 16, 1989, and $11,667,253 as of February 15, 1990.

---

[4] The interpolation factor for Feb. 16, 1989, was 47 days/365 days, and for Feb. 15, 1990, was 46 days/365 days.

Next, respondent's experts considered whether discounts (either for lack of marketability or for minority interest, or both) were appropriate. Initially, the experts did not believe a discount for lack of marketability was appropriate at the joint venture level. Subsequently, they concluded that a 10-percent lack of marketability discount was appropriate, stating:

> The chief asset of Powhatan Associates is the inventory and land to be developed for time shares, and ample allowance for lack of marketability was taken into account for that asset, both in the projections of income and in the application of a relatively large discount rate. There is judicial precedent for this judgment not to duplicate discounts already taken.

The experts further concluded that at the joint venture level only a relatively small discount (5 percent) for a minority interest was appropriate, stating:

> The history of the joint venture displays a careful attention to conservative development: inventory was kept low, and areas were built in clusters close to one another and the amenities, to allow for maximum use of the residual acreage should the time share development slow or cease. This history was taken into account in the real estate appraiser's finding of fair market value of the time share property. There is no reason that these practices should change if another entity stepped into the shoes of WVI as administrator of the project. The exit provisions of the joint venture agreement provide for a purchase (by the other venturers) of a selling venturer's interest at fair market value or at the price offered by a bona fide third party. A purchaser of a 1/3 interest might have the opportunity to purchase the entire entity under those exit provisions. We apply a 5% discount for the WVI minority interest to account for the risk that a purchaser of 1/3 interest might be invited to purchase all of the venture but be unwilling to do so, thus cancelling the 1/3 interest purchase. Because of the profitability of the venture to the other two "partners", this scenario is unlikely.

After application of these two discounts, respondent's experts opined that WVI's one-third pro rata interest in Powhatan Associates was $9,367,015 as of February 16, 1989, and $9,975,502 as of February 15, 1990.

This discounted value of WVI's interest in Powhatan Associates was incorporated into the balance sheet of WVI. The experts further adjusted WVI's balance sheet (1) to account for the fair market value of a 1-1/2-percent development fee payable to WVI from Powhatan Associates, (2) to apply a provision for the present value of taxes to be paid at the time of the time-share sales, and (3) to reduce from book to fair market value the interest WVI held in a parcel of undeveloped land in North Carolina. On the basis of these adjustments, the experts determined (1) the fair market value of WVI was $6,880,694 as of February 16, 1989, and $7,466,913 as of February 15, 1990, and (2) the pro rata value of the 800 shares and the 400 shares was $2,975,435 as of February 16, 1989, and $1,327,451 as of February 15, 1990.

In arriving at the value of the 1989 and 1990 stock issuance, respondent's experts' final step was to sequentially apply (1) a 20-percent ($595,087) minority interest discount and a 10-percent lack of marketability discount ($238,035) for 1989, and (2) a 50-percent ($663,726) minority interest discount and a 10-percent ($66,373) lack of marketability discount for 1990. Having done so, respondent's experts determined that the fair market value of the

February 16, 1989, stock issuance to Dr. Gow was $2,142,313 ($2,678 per share), and the fair market value of the February 15, 1990, stock issuance to Dr. Gow was $597,353 ($1,493 per share).

In determining the fair market value of the stock bonus, the experts considered the VTA agreement and the fact that Dr. Gow, at her election, could receive within 10 years up to 10,000 shares, at a maximum of 1,000 shares per year. The experts believed that before purchase an informed hypothetical buyer would require protection against the potential dilution effect of the share authorization, as well as the placing of the stock in a voting trust.

### C.  Court's Analysis and Conclusion

For ease of understanding, we have set forth in the appendices hereto a comparison of Mr. Gampel's and Ms. Maiden's-Ms. Kalmar's valuations. Giving due consideration to the totality of the evidence before us, and in particular the testimony and reports of the expert witnesses, we find the analysis and conclusions of respondent's experts more persuasive than those of petitioners' expert.  Consequently, we accept, with modifications discussed hereinafter, Ms. Maiden's and Ms. Kalmar's valuations.

We agree with respondent that Mr. Gampel's report contains fatal errors.  These errors include: (1) His understatement of

Powhatan Associates' anticipated income stream;[5] (2) the size of the discount rate (32 percent) he developed through the summation method; and (3) his application of a 15-percent contingency discount to reduce the adjusted book values of WVI as of the valuation dates. We conclude that these errors resulted in an unacceptable understatement of fair market value for the stock bonuses awarded to Dr. Gow.[6]

We agree with the valuation methodology used by Ms. Maiden and Ms. Kalmar (respondent's experts) but disagree with the quantum of the discounts they determined for lack of control and lack of

---

[5] Mr. Gampel determined Powhatan Associates' anticipated income stream by (1) projecting the number of intervals sold, and (2) estimating the sale price for those units. He projected the number of intervals sold by averaging the interval sales for the 2-year period preceding each valuation date. He then divided total sales by intervals sold for each of 1987, 1988, and 1989 in order to arrive at the average interval price for the applicable valuation date. By using this methodology, he used $12,250 as the average interval sale price for the 1987-88 period and $13,200 for the 1988-89 period. We believe Mr. Gampel's methodology to be flawed. The yearly interval sale price was trending upward, and by 1989 it was $13,300. The interval sale price used by Mr. Gampel for the 1989 and 1990 valuation dates was clearly understated, which in turn, resulted in the understatement of Powhatan Associates' income stream.

[6] We are mindful that besides the value of Powhatan Associates, there are other differences between the experts in valuing WVI, such as Mr. Gampel's reducing to 90 percent of face Mr. Henderson's note to WVI, whereas Ms. Maiden and Ms. Kalmar did not. Additionally, Mr. Gampel increased WVI's adjusted book value to include WVI's estimated earnings from the close of the end of the prior year to each of the respective valuation dates. We have chosen to disregard these differences but note that they would result in an overall increase in the value of WVI's stock.

marketability at both the Powhatan Associates and WVI levels.  The discounts they used were as follows:

### At Powhatan Associates Level

|                        | 1989 | 1990 |
|------------------------|------|------|
| Lack of control        | 5%   | 5%   |
| Lack of marketability  | 10   | 10   |

### At WVI Level

|                        | 1989 | 1990 |
|------------------------|------|------|
| Lack of control        | 20%  | 50%  |
| Lack of marketability  | 10   | 10   |

In contrast to these discounts, Mr. Gampel used the following discounts:

### At Powhatan Associates Level

|                        | 1989 | 1990 |
|------------------------|------|------|
| Lack of control        | 15%  | 15%  |
| Lack of marketability  | 30   | 30   |

### At WVI Level

|                        | 1989 | 1990 |
|------------------------|------|------|
| Lack of control        | 20%  | 30%  |
| Lack of marketability  | 30   | 30   |

We have duly considered and studied the factors and reasoning used by the experts in determining their respective discount amounts.  In this regard, we found Mr. Gampel's reasoning to be well founded and more persuasive than that of Ms. Maiden and Ms. Kalmar.  Mr. Gampel used empirical studies and factors (stated supra pp. 24-26) that we believe appropriate in formulating his

opinion as to the discount amounts, whereas respondent's experts did not. We are not persuaded by respondent's experts' reasoning in determining the quantum of the discounts. The quantum of the discount for lack of control ranged from a low of 5 percent at the joint venture level to a high of 50 percent at the WVI level. Moreover, we are mindful that initially respondent's experts believed a discount for lack of marketability was not appropriate at the joint venture level, but eventually changed their minds and applied a 10-percent discount. In contrast, Mr. Gampel's discount rates were consistent and uniform, ranging from 15 percent for lack of control at the joint venture level (20 percent for lack of control at the WVI level) to 30 percent for lack of marketability at both levels. Consequently, we adopt the quantum of the discounts for lack of control and lack of marketability at both levels for both valuation dates as determined by Mr. Gampel. Thus, the valuation conclusions of Ms. Maiden and Ms. Kalmar should be adjusted (reduced) to reflect Mr. Gampel's discount amounts. This adjustment can be made by the parties in their Rule 155 computation.

In reaching our conclusions, we have considered all arguments raised by the parties in their posttrial briefs. We reject, as apparently did petitioners' own expert, the argument (which petitioners' counsel alleges was conceded by Ms. Kalmar during her testimony) that the shares of WVI stock awarded to Dr. Gow have no

value because of the existence of the voting trust agreement and the potential dilution of WVI stock as a consequence of Dr. Gow's right to have 10,000 shares of WVI stock issued to her.

Issues 2 and 3.  Constructive Dividends

We next examine whether WVI's payments of petitioners' expenses for trips to Key West and Hawaii, as well as WVI's payments for the acquisition of the animal trophy collection, constitute constructive dividends to petitioners.

The amount of these expenditures is not in dispute.  Rather, the dispute centers upon whether these expenditures were made primarily to advance petitioners' personal interests or were for legitimate business interests of WVI.  Petitioners maintain that the trips to both Key West and Hawaii generated numerous ideas and concepts that were considered and later incorporated by Powhatan Associates in the time-share resort.  Further, petitioners maintain that the amounts expended on the procurement of the animal trophy collection created an amenity intended to attract buyers of the time-share intervals.  Respondent, on the other hand, maintains that these expenditures were made primarily to provide a substantial personal benefit to petitioners.

It has long been recognized that when a corporation makes an expenditure or distribution out of its earnings and profits (without an expectation of repayment) primarily to confer a substantial personal benefit to a shareholder, the value of the

benefit conferred is taxable as a constructive dividend.  See secs. 61(a)(7), 301, 316; Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Hash v. Commissioner, 273 F.2d 248, 250 (4th Cir. 1959), affg. T.C. Memo. 1959-96; Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985).  A constructive dividend can take the form of either a distribution of corporate funds, the use of corporate property for personal purposes, or paying off a personal expense of the shareholder by the corporation.  See Ireland v. United States, supra; Wall v. United States, 164 F.2d 462 (4th Cir. 1947); Martin v. Commissioner, T.C. Memo. 1997-492; Yarbrough Oldsmobile Cadillac, Inc. v. Commissioner, T.C. Memo. 1995-538.  Control of a corporation by a shareholder as well as a corporate history of not paying dividends weighs strongly in favor of finding a constructive dividend.  See Yarbrough Oldsmobile Caddillac, Inc. v. Commissioner, supra; Thielking v. Commissioner, T.C. Memo. 1987-227, affd. 855 F.2d 856 (8th Cir. 1988).

In determining whether or not the expenditure related to the business of the corporation, we must ascertain whether the payment or expenditure has independent and substantial importance to the paying corporation.  See T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993).  An expenditure generally does not have independent and substantial importance to the distributing corporation if it is not deductible under section 162.  See, e.g.,

P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1089 (9th Cir. 1987), affg. T.C. Memo. 1984-549; Gill v. Commissioner, T.C. Memo. 1994-92, affd. 76 F.3d 378 (6th Cir. 1996). Thus, our analysis begins by focusing upon whether WVI's expenditures were ordinary and necessary in the context of the time-share resort industry. An expense is ordinary if it is common or frequent in the context of the particular business out of which it arose. See Deputy v. DuPont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. See Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).

A. Expenditures for the Hawaii and Key West Trips

Petitioners' evidence substantiating their activities of their Key West and Hawaii trips consisted of their testimony and prepared itineraries. We view petitioners' testimony with caution, as it was self-serving. In addition, the itineraries were prepared by petitioners at least a year after the trips and in response to a tax audit; understandably, we question their reliability. Moreover, we are unable to ascertain from the itineraries the business relevance of many of petitioners' activities. Accordingly, petitioners failed to persuade us that the purpose of these trips was not primarily their personal benefit. See Grossman v. Commissioner, T.C. Memo. 1996-452, supplemented by T.C. Memo. 1997-451, affd. 182 F.3d 275 (4th Cir. 1999); Fong v. Commissioner,

T.C. Memo. 1991-180. Respondent, on the other hand, produced numerous billing statements and invoices as well as testimony regarding WVI's expenditures for 1991.  We find respondent's evidence persuasive.

According to petitioners, these trips were undertaken to investigate and research Powhatan Plantation's competition in order to incorporate comparable resort features and services that would make them more attractive to potential customers.  We view this assertion with skepticism.  In our opinion, the innovations and research petitioners sought could have been obtained without the elements of substantial personal pleasure.  To illustrate, petitioners spent a large amount of time on these trips enjoying shopping malls, theme parks, and historical locations.  Many of these trips were taken around the Thanksgiving, Christmas, or New Year's holidays and were the only time during the year petitioners managed to escape their everyday routine.  WVI subsidized many of the incidental expenses incurred by the spouses of members of the "management team".  During some of the activities, dinners costing $1,000 or more, as well as room service bills of almost $500, became the norm.  Although it might be ordinary and necessary for Powhatan Plantation to investigate its competition in the same geographic area, it has not been shown to be ordinary and necessary for petitioners to examine resorts that are located in distant areas and are not in direct competition with Powhatan Plantation.

In light of petitioners' control of WVI, such expenses become especially suspect. We conclude that the primary purpose of these trips was petitioners' personal enjoyment.

Petitioners' visits were, at best, of marginal benefit to WVI and the joint venture. As we have previously stated:

> a trip that is primarily for the taxpayer's individual pleasure is not converted into a business trip merely because some short portions of the trip involve business activities, even when it is clear that the asserted business activities actually occurred and that those business activities actually affected the cost of the trip.

Grossman v. Commissioner, supra (citing George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. 686 (1984)).

In Grossman, a case whose facts are similar to those in this case, we found that corporate expenses for trips taken by the taxpayer and his wife that had a slight business component constituted constructive dividends. In Grossman, the taxpayer and his wife, the two principal owners in a closely held corporation, took multiple trips to resort locations across North America, ostensibly to conduct discussions regarding corporate business. The taxpayers subsequently caused their corporation to reimburse them for their expenses. Relying solely upon the taxpayer's assurances that there were no personal expenses involved, the corporation's accountant claimed deductions for travel and entertainment expenses. In finding that the corporation made constructive dividends to the taxpayer, we disagreed with the

taxpayer's characterization of the trips as relating to business, and held that the predominant purpose of most of the trips, despite having an incidental business purpose, was personal pleasure. We find no reason or distinction that compels a different result in the case before us. Petitioners have failed to persuade us that the expenditures were predominantly for business purposes. Accordingly, we sustain respondent's determination that for the years in issue, the total amounts expended by WVI for petitioners' entertainment expenses to Hawaii and Key West constitute constructive dividends to petitioners.

B.  Expenditures for the Animal Trophy Collection

We now turn our attention to WVI's expenditures for the procurement of the animal trophy collection. Once again, our factual analysis focuses upon whether the expenditures have an independent and substantial importance to the payor corporation. See Gill v. Commissioner, T.C. Memo. 1994-92. Although amounts spent advancing a personal interest of a taxpayer may constitute constructive dividends, amounts expended for the legitimate improvement of a corporation's trade or business do not.

Petitioners suggest that because the expenditures for the animal trophy collection constitute capital expenditures, they should receive different treatment than deductible expenses with regard to constructive dividend treatment. We disagree. Even if we were to accept the premise that these expenses otherwise were

amortizable under section 263, capital expenditures, if made for the personal benefit of the shareholder, can constitute constructive dividends. See, e.g., Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962); Gill v. Commissioner, supra.

The expenses incurred for the animal trophy collection were composed mainly of costs associated with the acquisition and display of the animal trophy mounts; i.e., acquisition and mounting costs. Petitioners contend that the animal trophy collection was to be used both as a marketing tool and as an amenity of Powhatan Plantation. They allege the collection was to tour selected sites around the country as well as to be placed in a "museum" located on Powhatan Plantation. Petitioners assert that such displays would attract potential buyers of the time-share intervals. However, most of the animal trophy mounts were put on display at Bob's and the Y.O. Ranch.

We find petitioners' argument unconvincing. Powhatan Plantation had a colonial working plantation theme, emphasizing the history of the Williamsburg-Jamestown, Virginia, area. The "world-class" animal trophy mounts collection was designed to be composed of exotic animals whose natural habitat did not include the tidewater area of Virginia. We do not believe the display of exotic animals such as elk, caribou, or Armenian red sheep furthers the historical colonial theme that was in place as a marketing strategy. In this respect we are mindful that notably absent from

the marketing brochure created by Offsite to highlight the salient amenities of the time-share resort was the mention of an animal trophy collection. Also revealing is the fact that the other members of the joint venture were unaware of the acquisition of an animal trophy collection, which is of significance in view of the fact that the joint venture agreement required a majority of the venturers to decide nonroutine matters.

In acquiring the animal trophy collection, Mr. Gow personally hunted the animals and made numerous trips to Y.O. Ranch and Alaska. On several occasions he took his wife along as a traveling companion. He used a customized handgun and spent many hours practicing his shooting skills at a range. He obviously enjoyed hunting. Although the mere enjoyment of one's work may not alone transform a work assignment into a hobby, see Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. 463, 468 (1955), petitioners' enjoyment, along with the questionable business purpose, strongly suggests the hunting activities were for Mr. Gow's personal benefit.

In viewing the entire record, we are convinced that all expenditures incurred for the animal trophy collection were primarily for the personal benefit of petitioners and thus should be treated as a constructive dividend. In an attempt to convince us otherwise, petitioners cite Sanitary Farms Dairy, Inc., as support that costs associated with hunting trips can have a

legitimate business purpose. In <u>Sanitary Farms Dairy, Inc.</u>, we found that "The cost of a big game hunt in Africa does not sound like an ordinary and necessary expense of a dairy business in Erie, Pennsylvania, but the evidence in this case shows clearly that it was and was so intended." <u>Id.</u> at 467. Unlike here, in <u>Sanitary Farms Dairy, Inc.</u>, we were satisfied from the evidence in the record that costs associated with the safari actually assisted in the marketing of the product line of the business. Thus, <u>Sanitary Farms Dairy, Inc.</u>, is distinguishable from this case and offers no support to petitioners' cause.

In sum, we hold that WVI's payments of petitioners' expenses for trips to Key West and Hawaii, as well as WVI's payments for the acquisition of the animal trophy collection, constitute constructive dividends to petitioners.

<u>Issue 4. Imposition of the Fraud or Accuracy-Related Penalty</u>

We now address whether petitioners are liable for the fraud penalty under section 6663(a) or alternatively the accuracy-related penalty under section 6662(a). Section 6662(a) imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of the underpayment attributable to negligence or disregard of rules or regulations or to a substantial understatement of tax. However, if section 6663(a) is applicable, a penalty in an amount equal to 75 percent of the underpayment is imposed. Respondent relies primarily on the record in its entirety and concludes that

petitioners engaged in a pattern of conduct that illustrates their intent fraudulently to evade payment of Federal income tax. Petitioners obviously disagree.

Fraud is defined as an intentional act of a taxpayer to evade the payment of tax that is believed to be owing by conduct that conceals, misleads, or otherwise prevents the collection of such tax.  See Sadler v. Commissioner, 113 T.C. 99, 102 (1999); McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Snavely v. Commissioner, T.C. Memo. 1994-256.  The Commissioner has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Beddow v. Commissioner, T.C. Memo. 1999-232.  To satisfy this burden, the Commissioner must show: (1) That an underpayment exists; and (2) that the taxpayer intended to evade taxes known to be owing by engaging in conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

The existence of fraud is a question of fact to be resolved from the entire record and can be proven by circumstantial evidence.  See Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. 578 F.2d 1383 (1978). But fraud is not presumed; it is required to be shown through

affirmative evidence.  See <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970).

Courts have developed various factors or badges which tend to establish fraud.  These include:  (1) A pattern of understatement of income; (2) inadequate records; (3) concealment of assets; (4) income from illegal activities; (5) attempting to conceal illegal activities; (6) implausible or inconsistent explanations of behavior; and (7) dealings in cash.  See <u>McGee v. Commissioner</u>, supra at 260; <u>Snavely v. Commissioner</u>, <u>supra</u>.  In addition, the taxpayer's sophistication, education, and intelligence may also be considered in determining the existence of fraud.  See <u>Sadler v. Commissioner</u>, <u>supra</u>.  No single factor or any combination of factors will necessarily lead us to the conclusion that fraud exists.  We must examine whether a pattern of fraudulent intent was established on the basis of an examination of the entire record.

Respondent argues that the record is replete with indicia of fraud by petitioners, including the following: (1) Gross undervaluation of the 1989 and 1990 stock bonus awards; (2) the hiding of the animal trophy collection expenditures by recording them in different accounts in the company's general ledger at the direction of Dr. Gow; (3) lack of petitioners' credibility in statements made both at audit and at trial; and (4) charging of personal items as business expenses.  Moreover, respondent claims that petitioners' knowledge of tax and accounting issues supports

a conclusion that they structured their dealings in WVI and Powhatan Associates in such a way as to purposely evade the payment of taxes. We disagree.

We do not find petitioners to be tax sophisticated. Although marginally experienced in business matters, neither Dr. nor Mr. Gow had substantial knowledge or training in tax law. Dr. Gow's advanced degrees were in the field of education, not business. Before the formation of WVI, her experience and training dealt more in the operational management and planning side of business than with the accounting or economic side. Several courses in tax do not make one an expert. Additionally, we draw no inferences regarding Dr. Gow's tax sophistication from a letter she wrote to her personal accountant (Mr. Bielat) regarding her entitlement to specific deductions.

Although we find petitioners' testimony self-serving, we do not necessarily find their testimony untruthful or devious. Nor are we convinced that petitioners deliberately caused their travel and entertainment expenses to be hidden in the company's books in a way designed to avoid taxes. The fact that Revenue Agent Puchaty could not find the expenses in the accounts where he expected them to be does not persuade us that petitioners intentionally "hid them".

Respondent cites Grossman v. Commissioner, T.C. Memo. 1996-452, for the proposition that in circumstances similar to those

presented here, we upheld the imposition of the fraud penalty under section 6663(a). Within the fraud context, we find the situation in Grossman distinguishable from that involved herein. The taxpayer in Grossman was a practicing lawyer specializing in Federal income taxation. He held an LL.M. in taxation from New York University and had previously worked for the Internal Revenue Service. He obviously possessed a substantial level of sophistication in the area of tax law. Here, petitioners, although highly intelligent, do not possess the same level of tax expertise.

We recognize that petitioners have grossly undervalued the stock bonus awards and charged personal items as business expenses. We have no doubt that petitioners' conduct in this case comes close to the line that separates a conscious "disregard of rules or regulations" from an "intent to evade taxes believed to be owing". However, even where there is a strong suspicion of an intent to evade taxes, we are hesitant to impose the section 6663(a) penalty unless we are convinced that the Commissioner satisfied his burden of proof. See Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). Here, a complete review of the record has convinced us that respondent has failed to do so. Accordingly, we decline to impose the fraud penalty upon petitioners.

Petitioners, however, have failed to prove that they acted with reasonable cause and in good faith. Evidence in the record

persuades us that petitioners negligently disregarded rules or regulations.  See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985); sec. 1.6662-3(b)(1), Income Tax Regs.  Accordingly, we hold petitioners liable for the accuracy-related penalty on the entire underpayment for the years in issue pursuant to section 6662(a).

In reaching our conclusions herein, we have considered all of the arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing and concessions of the parties,

<u>Decision will be</u>

<u>entered under Rule 155</u>.

APPENDIX A

Comparison of Experts' Valuation of
Williamsburg Vacations, Inc. Stock
As of February 16, 1989

Valuation Of Powhatan Associates

|  | | Petitioners' Expert | | Respondent's Experts |
|---|---|---|---|---|
| "Pre-tax" value of Powhatan | | $18,817,787 | | $32,866,718 |
| "Post-tax" value of Powhatan | | 11,704,663 | | |
| Pro-rata value of 1/3 joint venture interest | | 3,902,000 | | 10,955,573 |
| Discount for lack of control | 15% | (585,300) | 5% | (547,779) |
| Discount for lack of marketability | 30% | (995,010) | 10% | (1,040,779) |
| Fair market value of Powhatan 1/3 interest | | 2,321,690 | | 9,367,015 |

Valuation Of WVI

|  | | Petitioners' Expert | Respondent's Experts |
|---|---|---|---|
| Shareholders' equity, 12/31/88 | | $840,100 | $840,086 |
| Estimated earnings to 2/16/89 | | 359,324 | |
| Fair market value of Powhatan | | 2,321,690 | 9,367,015 |
| Fair market value of development fee income | | 697,000 | 1,596,262 |
| FMV promissory note from shareholder | | 19,223 | |
| Land held for investment | | 10,000 | 10,000 |
| Other changes to assets | | | 22,127 |
| Cost basis of Powhatan joint venture | | (369,400) | (369,421) |
| Book amount of promissory note | | (192,230) | |
| Land held for investment at cost | | (357,000) | (357,000) |
| Tax adjustment | | | (4,228,419) |
| Other changes to liabilities | | | 207 |
| | | 3,328,707 | 6,880,857 |
| Contingency discount | 15% | (499,306) | --- |
| Fair market value of Williamsburg Vacations, Inc. | | 2,829,401 | 6,880,857 |

Valuation Of The Shareholdings

|  | Petitioners' Expert | | Respondent's Experts | |
|---|---|---|---|---|
| Per share pro-rata value |  | $1,529 |  | $3,719 |
| Pro-rata value of 800 shares |  | 1,223,525 |  | 2,975,506 |
| Discount for lack of control | 20% | (244,705) | 20% | (595,101) |
| Discount for lack of marketability | 30% | (293,646) | 10% | (238,040) |
| Fair market value of 800 shares in WVI |  | 685,174 |  | 2,142,364 |
| Rounded |  | 685,000 |  |  |
| Per share |  | 856.25 |  | 2,678 |

APPENDIX B

Comparison of Experts' Valuation of
Williamsburg Vacations, Inc. Stock
As of February 15, 1990

Valuation Of Powhatan Associates

|  | | Petitioners' Expert | | Respondent's Experts |
|---|---|---|---|---|
| "Pre-tax" value of Powhatan |  | $22,456,921 | | $35,001,760 |
| "Post-tax" value of Powhatan |  | 13,968,205 | | |
| Pro-rata value of 1/3 joint venture interest |  | 4,656,000 | | 11,667,253 |
| Discount for lack of control | 15% | (698,400) | 5% | (583,363) |
| Discount for lack of marketability | 30% | (1,187,280) | 10% | (1,108,389) |
| Fair market value of Powhatan 1/3 interest |  | 2,770,320 | | 9,975,502 |

Valuation Of WVI

|  | | Petitioners' Expert | Respondent's Experts[1] |
|---|---|---|---|
| Shareholders' equity, 12/31/89 |  | $1,189,400 | $1,189,397 |
| Estimated earnings to 2/15/90 |  | 348,794 | |
| Fair market value of Powhatan |  | 2,770,320 | 9,975,502 |
| Fair market value of development fee income |  | 799,000 | 1,557,915 |
| FMV promissory note from shareholder |  | 19,223 | |
| Land held for investment |  | 10,000 | 10,000 |
| Other changes to assets |  | | 22,126 |
| Cost basis of Powhatan joint venture |  | (546,560) | (546,556) |
| Book amount of promissory note |  | (192,230) | |
| Land held for investment at cost |  | (357,000) | (357,000) |
| Tax adjustment |  | | (4,391,591) |
| Other changes to liabilities |  | | (12,881) |
|  |  | 4,040,947 | 7,466,912 |
| Contingency discount | 15% | (606,142) | --- |
| Fair market value of Williamsburg Vacations, Inc. |  | 3,434,805 | 7,466,912 |

---

[1]    We are mindful that several mathematical errors exist in respondent's computation.  We do not believe these discrepancies are material.

Valuation Of The Shareholdings

|  | Petitioners' Expert | | Respondent's Experts | |
| --- | --- | --- | --- | --- |
| Per share pro-rata value | | $1,527 | | $3,319 |
| Pro-rata value of 400 shares | | 610,632 | | 1,327,451 |
| Discount for lack of control | 30% | (183,190) | 50% | (663,725) |
| Discount for lack of marketability | 30% | (128,233) | 10% | (66,373) |
| Fair market value of 400 Shares in WVI | | 299,210 | | 597,353 |
| Rounded | | 299,000 | | |
| Per share | | 747.50 | | 1,493 |