UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROBERT T. GOW; KAY F. GOW,
  *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,
  *Respondent-Appellee.*

No. 00-2119

Appeal from the United States Tax Court.
(Tax Ct. No. 96-25651)

Argued: May 9, 2001

Decided: September 24, 2001

Before LUTTIG, MOTZ, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Craig Dennis Bell, MCGUIRE WOODS, L.L.P., Richmond, Virginia, for Appellants. Rachel Ida Wollitzer, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** James C. Roberts, MAYS & VALENTINE, Richmond, Virginia, for Appellants. Paula M. Junghans, Acting Assistant Attorney General, Teresa E. McLaughlin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Dr. Kay F. Gow and her husband Robert T. Gow appeal the March 20, 2000 decision of the United States Tax Court, which ruled that they jointly owed the Internal Revenue Service substantial deficiencies in connection with their individual returns for the tax years 1989 through 1992. The Gows contend that the Tax Court improperly valued shares of stock in Williamsburg Vacations, Inc. ("WVI") which had been awarded to Dr. Gow by WVI as bonus compensation in 1989 and 1990. Additionally, the taxpayers maintain that the Tax Court erred in concluding that certain travel-related expenses paid by WVI were primarily for their personal benefit and constituted constructive dividends paid to Dr. Gow. As we explain below, each of these contentions is without merit, and we affirm.

I.

WVI was incorporated in July 1983 to develop a time-share resort near Williamsburg, Virginia. The initial shareholders were Dr. Gow and Horace Henderson, owning 650 and 350 WVI shares, respectively. On September 30, 1983, Dr. Gow sold 200 of her WVI shares to E. Corbell Jones. That same day, Dr. Gow and Jones entered into a voting trust agreement (the "Voting Trust") concerning all of their WVI stock shares, designating Mr. Gow as the trustee.[1] The Voting Trust was to continue for ten years until September 30, 1993, and it was amended on October 24, 1988, to include any WVI stock Dr. Gow had acquired or would thereafter acquire. During each of the four tax years in issue, 1989 through 1992, Dr. Gow served as both

---

[1]A voting trust is a device whereby two or more persons, owning stock with voting powers, divorce the stock's voting rights from its ownership, retaining the latter in themselves and transferring the former to a trustee. *Black's Law Dictionary* 1577 (6th ed. 1990).

President of WVI and as Chairman of its Board of Directors. During this period her husband served as Secretary of WVI, as a member of its Board, and as trustee of the Voting Trust.

On October 19, 1983, Dr. Gow, Henderson, and Jones signed an agreement to purchase Powhatan Plantation, on which the time-share resort was to be built, and they then assigned their rights in Powhatan Plantation to WVI. On November 19, 1986, in order to alleviate financing problems related to the resort's construction, WVI, along with Powhatan Plantation's construction contractor (Bush Construction Co.) and its marketing company (Offsite International), entered into a new venture called Powhatan Associates. Powhatan Associates assumed ownership and operation of Powhatan Plantation, and WVI became a one-third owner of Powhatan Associates. In 1997, Powhatan Associates sold the Powhatan Plantation resort to Signature Resorts, Inc. for the sum of $59.1 million.

On February 16, 1988, the WVI Board of Directors authorized the issuance of 10,000 shares of stock to Dr. Gow as bonus compensation, at a maximum rate of 1,000 shares per year. Thereafter, on February 16, 1989, WVI issued 800 of these authorized shares of WVI stock to Dr. Gow as bonus compensation (the "1989 stock"). The following year, on February 15, 1990, WVI awarded an additional 400 of these authorized shares as bonus compensation to Dr. Gow (the "1990 stock").[2] On their 1989 and 1990 jointly-filed tax returns, the Gows reported the value of these two bonus compensation stock awards (the "bonus compensation stock") at $40,000 and $20,000, respectively.

Between 1984 and 1992 the Gows made numerous visits, all paid

---

[2]The Stipulation of Facts filed by the parties in the Tax Court indicates that after Dr. Gow received the 1989 and 1990 bonus compensation stock she owned 1,700 of 2,250 outstanding shares of WVI. J.A. 613. By our calculations, however, she owned 1,650 of 2,200 outstanding shares of WVI. Regardless of which figures are correct, by 1990 Dr. Gow owned the vast majority of the shares of WVI, that is, between seventy-five and seventy-six percent. As such, her husband, as trustee of the Voting Trust (possessing voting rights over her shares and Jones's 200 shares), controlled WVI.

for by WVI, to vacation resorts in Hawaii and Florida. On at least seven occasions, the WVI Board authorized funding of these trips, purportedly for the Gows to remain knowledgeable about innovations in the resort industry. During these trips, the taxpayers were guests in lavish hotels and resorts costing up to $900 per night, and records introduced at trial indicate that they dined in restaurants charging upwards of $2000 for a single meal.

WVI's corporate tax returns were audited in July 1991, and the Gows' jointly-filed tax returns were thereafter included in the audit. On August 29, 1996, the Commissioner of Internal Revenue issued a notice of deficiency to the taxpayers for the tax years 1989 through 1992. In the notice of deficiency, the Commissioner asserted that the fair market value of the 1989 stock and the 1990 stock, upon its acquisition, was $1,600,000 and $800,000, respectively, and that the taxpayers had received constructive dividends from WVI for 1989, 1990, 1991, and 1992, in the sums of $305,072, $395,225, $341,521, and $323,281, respectively.[3] The Gows thereafter petitioned in the Tax Court for a redetermination of these deficiencies. They claimed that, first of all, the Commissioner had improperly valued the bonus compensation stock paid to Dr. Gow in 1989 and 1990, and secondly, that the expenses paid by WVI in connection with the taxpayers' several trips to Hawaii and Florida did not constitute constructive dividends paid by WVI to Dr. Gow.

Following a trial conducted in March 1999, the Tax Court made extensive findings of fact and conclusions of law. It filed its lengthy

---

[3]In total, the Commissioner asserted annual income tax deficiencies against the taxpayers in the sums of $522,221, $334,663, $109,047, and $103,224 for 1989, 1990, 1991, and 1992, respectively. Pursuant to I.R.C. § 6663(a), the Commissioner assessed seventy-five percent fraud penalties of $391,666, $250,997, $81,785, and $77,418, for the years 1989, 1990, 1991, and 1992, respectively. In the event that the fraud penalties were found inapplicable, the Commissioner alternatively sought accuracy-related penalties of twenty percent of the underpayment in question. After reevaluation, the Commissioner increased the 1989 tax deficiency to $877,054 and the 1991 tax deficiency to $153,214. Consequently, to reflect these increases, the Commissioner assessed larger civil fraud penalties of $657,791 and $114,911, for those years, respectively.

"Memorandum Findings of Fact and Opinion," on March 20, 2000 (the "Opinion"), disposing of the dispute in a manner generally favorable to the Commissioner. *Gow v. Commissioner*, 79 T.C.M. (CCH) 1680 (2000).[4] At trial, the Commissioner's experts testified that the fair market value of the 1989 stock was $2,142,313 and that the fair market value of the 1990 stock was $597,353. By contrast, an expert witness retained by the Gows valued the 1989 stock at only $685,000 and the 1990 stock at only $299,000. The Tax Court, after evaluating the conflicting evidence before it, adopted the values proposed by the Commissioner's experts. However, it reduced those values by applying the higher discount rates for two factors, denominated as "lack of control" and "marketability" of Powhatan Associates and WVI, presented by the Gows' expert. In its valuation of the bonus compensation stock, the Tax Court considered and rejected the Gows' contention (contrary to the evidence of their expert) that the stock had no value whatsoever because it was subject to the Voting Trust.

With respect to the several Florida and Hawaii trips, and the expenses incurred incident thereto, the Tax Court determined that their primary purpose was the personal enjoyment of the taxpayers, not the economic benefit of WVI. It found that the expenses attributable to those trips, totalling over $1.3 million, constituted constructive dividends paid by WVI to Dr. Gow, and it concluded that they were taxable to the Gows in the years of their receipt, that is, 1989, 1990, 1991, and 1992. The court found yearly income tax deficiencies of $410,796 in 1989, $196,961 in 1990, $102,441 in 1991, and $82,949 in 1992. Additionally, the court found that the Gows owed accuracy-related penalties under I.R.C. § 6662(a) for the years 1989, 1990,

---

[4]The Tax Court did not accept the Commissioner's position in its entirety. In addition to rejecting some of the valuation testimony of the Commissioner's experts, the Tax Court also declined to assess the taxpayers the very substantial civil fraud penalties sought by the Commissioner. In denying the civil fraud penalties, the court recognized that the fraud issue was close, finding that the Gows' "conduct in this case comes close to the line that separates a conscious 'disregard of rules or regulations' from an 'intent to evade taxes believed to be owing.'" *Gow*, 79 T.C.M. at 1695. The Commissioner has not appealed the denial of civil fraud penalties.

1991, and 1992 in the sums of $82,159.20, $39,392.00, $20,488.20, and $16,589.80, respectively.[5]

On appeal, the Gows make three basic contentions. First, they maintain that the Tax Court should have valued the 1989 stock and the 1990 stock at zero. Second, they contend that the court's methodology for determining the fair market values of the bonus compensation stock was clearly erroneous. Third, they insist that the travel expenditures paid by WVI for their various trips to Hawaii and Florida were not for their personal benefit, and therefore are not taxable to them as constructive dividends paid to Dr. Gow. We possess jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

## II.

We review de novo the Tax Court's conclusions on questions of law. *Waterman v. Commissioner*, 179 F.3d 123, 126 (4th Cir. 1999). The Tax Court's findings of fact, however, may be set aside only if they are clearly erroneous, and factual determinations are clearly erroneous only if "on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been made." *Zfass v. Commissioner*, 118 F.3d 184, 188 (4th Cir. 1997) (quoting *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir. 1984)). As such, determinations of fair market value made by the Tax Court after trial constitute findings of fact, subject to our review only for clear error. *Burbage v. Commissioner*, 774 F.2d 644, 646 (4th Cir. 1986).

## III.

### A.

The trier of fact normally places a fair market value on corporate stock by simply examining its market price. In closely-held corporations, however, there are often no arm's-length sales of corporate stock on which to base a determination of fair market value. In these instances, the fair market value of such stock is determined by utiliz-

---

[5]As we observed, the Tax Court declined to impose the civil fraud penalties sought by the Commissioner under I.R.C. § 6663(a).

ing the well-accepted hypothetical willing buyer-willing seller concept. "The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). As the Supreme Court has explained, fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Id.* (quoting Treas. Reg. § 20-2031-1(b) (1958)). In conducting the valuation inquiry, the trier of fact must look to the "existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in determining a selling price." *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 231 (1990).

In this instance, application of the hypothetical willing buyer-willing seller test was appropriately employed by the Tax Court. As reflected in its Opinion, the court looked to the acquisition dates in 1989 and 1990, i.e., when the WVI shares were delivered as bonus compensation to Dr. Gow, and it imagined that the corporation instead had sold those shares to some hypothetical third party. The price that the hypothetical third party would have paid for the stock on February 16, 1989, and February 15, 1990, was used to determine its fair market value. *See Gow*, 79 T.C.M. at 1685-86 (citing *United States v. Cartwright*, 411 U.S. 546 (1973)).

The Gows contend that the Tax Court committed clear error in failing to conclude that the Voting Trust rendered all the bonus compensation stock valueless. Specifically, they assert that, because the WVI shares awarded to Dr. Gow as bonus compensation in 1989 and 1990 were thereafter subject to the Voting Trust, Dr. Gow could not vote them in the affairs of WVI and thus they were of no value.[6] The Gows seek to buttress this contention by making an analogy to the restrictions imposed by Securities and Exchange Commission Rule 144, which requires the holder of certain securities to have held them for at least two years before being able to sell them. In *Estate of Gilford*

---

[6]Notably, the Gows' own testifying expert witness rejected this assertion, and he concluded that the shares should not be valued at zero. As we have noted, he valued the 1989 stock at $685,000 and the 1990 stock at $299,000.

*v. Commissioner*, 88 T.C. 38, 58-59 (1987), the Tax Court concluded that in valuing stock, the restrictions imposed by Securities and Exchange Commission Rule 144 should be taken into consideration. By extension, the taxpayers assert that in valuing the bonus compensation stock the Tax Court should have considered the restrictions imposed on the stock by the Voting Trust, and it should have concluded that all of Dr. Gow's WVI stock was valueless.

We have carefully considered the Gows' contention in this respect, both as made in their briefs and as presented at oral argument, and we see it as meritless. A hypothetical buyer would not have purchased the bonus compensation stock from the corporation subject to the Voting Trust. The willing buyer is a purely hypothetical purchaser who does not reflect the personal characteristics of the actual recipients of the stock. *See Estate of Watts v. Commissioner*, 823 F.2d 483, 486 (11th Cir. 1987) ("[T]he Commissioner is correct in arguing that the actual subjective intention of the [parties] . . . is irrelevant."); *Estate of Bright v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981) ("[T]he 'willing seller' is not the estate itself, but is a hypothetical seller."); *Kolom v. Commissioner*, 644 F.2d 1282, 1288 (9th Cir. 1981) (agreeing with the Tax Court that "the willing buyer/willing seller test does not refer to Kolom's own unwillingness to sell [the stock] under the particular circumstances of his case."). The Voting Trust simply constituted a private agreement between stockholders of WVI and the trustee. *See supra* note 1. Stock shares of a corporation are not encumbered or diminished in value simply because some of its shareholders, after acquisition, have placed their shares into a voting trust. In short, this Voting Trust was personal to Dr. Gow, and the restrictions imposed by it would not attach to any hypothetical purchaser.

The foregoing analysis also serves to defeat the Gows' analogy to Securities and Exchange Commission Rule 144, or for that matter to any other federal securities statute or regulation. Any restrictions imposed by federal securities statutes or regulations are binding on *both* the actual purchaser (here, Dr. Gow) and also on any other purchaser (i.e., the hypothetical buyer). Restrictions imposed by voting trusts, however, bind *only* the parties to the voting trust (here, Dr. Gow). Voting trust restrictions therefore have no impact on a hypothetical purchaser who is not a party to the voting trust agreement. Thus, any hypothetical purchaser would have purchased the 1989 and

1990 bonus compensation stock free of the Voting Trust, and would have paid fair market value for those stock shares. As such, the Tax Court's determination that the bonus compensation stock received by Dr. Gow in 1989 and 1990 possessed the fair market values placed on it, as of the dates on which she acquired it, was not clearly erroneous.

## B.

### 1.

It is apparent from the record that the Tax Court undertook an extensive and careful analysis in order to fairly value the bonus compensation stock. After carefully considering the testimony of the taxpayers' expert and that of two of the Commissioner's experts, the court accepted the opinions of the Commissioner's experts on most — but not all — of its valuation decisions. The court carefully explained that, for multiple reasons, the Commissioner's valuation methodology was more persuasive. It observed that the Gows' expert had improperly reduced the value of the two companies, Powhatan Associates and WVI, by (1) understating the income stream of Powhatan Associates, (2) applying an excessive thirty-two percent discount rate to Powhatan Associates' estimated cash-flow stream, and (3) using an excessive fifteen percent contingency discount that further reduced the adjusted book value of WVI. Nevertheless, the court adopted the higher discount rates presented by the Gows' testifying expert for the factors of lack of control and marketability.

### 2.

The Gows raise seven specific challenges to the Tax Court's valuation methodology. They direct five of these objections to the Tax Court's methodology in valuing Powhatan Associates, and they make two challenges to the court's methodology in valuing WVI.

First, the Gows assert that the Tax Court erred in projecting that Powhatan Associates would sell 1800 and 1900 time-share intervals in 1989 and 1990, respectively. They contend that these projections were an unreasonable increase in the rate of such sales compared to

past years. Second, and closely related to the first contention, the tax-payers maintain that the court overstated Powhatan Associates' total value by projecting sales revenue based on an excessive asking price for the time-share intervals. Third, the Gows assign error to the Tax Court's failure to consider administrative, general, and sales costs in valuing Powhatan Associates' profits. Fourth, the taxpayers contend that the Tax Court's application of a twenty-five percent discount rate to the net value of Powhatan Associates was too low, because it accounted for only the property Powhatan Associates owned and did not account for the accompanying business itself. Fifth, the Gows assert that even though Powhatan Associates is a non-taxable entity, WVI's stake in Powhatan Associates is taxable. As such, they contend that the value of Powhatan Associates should have been discounted to reflect the state and federal taxes WVI incurs.

The taxpayers make two challenges to the court's valuation of WVI. They contend, first of all, that the Tax Court overvalued WVI's assets by failing to discount the value of a $192,330 promissory note that had been outstanding for over five years, maintaining that WVI was likely to recover only a fraction of its face value. Additionally, the taxpayers maintain that the value of WVI's assets should have been further discounted because of the risk of dissolution arising from a lawsuit filed by one of WVI's original shareholders.

As we have observed, the Tax Court's valuation determinations constitute findings of fact, *see Burbage*, 774 F.2d at 646, which we may set aside only if clearly erroneous. *See Zfass*, 118 F.3d at 188. The various challenges to the Tax Court's valuation methodology are based either on the court's determination to use one valuation theory instead of another, or on its finding that certain facts should be given more consideration than others. Our review of these valuation decisions is controlled by the principle that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Hendricks v. Commissioner*, 32 F.3d 94, 97 (4th Cir. 1994)). We have made a careful and thorough review of the Tax Court's decision in this regard, and we are not "left with the definite and firm conviction that a mistake has been made." *Id.* We are therefore satisfied that the Tax Court's valuation findings with respect to Powhatan Associates and WVI were not clearly erroneous.

## C.

Finally, the taxpayers contend that the Tax Court erred in deciding that the travel-related expenses for their trips to Hawaii and Florida in the relevant years, totalling over $1.3 million, were primarily for their personal benefit and constituted constructive dividends paid to Dr. Gow by WVI. The applicable principle of law on this point is not disputed: when a corporation makes an expenditure primarily to confer a substantial personal benefit on a shareholder, the value of the benefit conferred is taxable as a constructive dividend. *Mills v. Commissioner*, 840 F.2d 229, 235 (4th Cir. 1988) (explaining that "if the primary purpose of the transfer was to benefit the individual stockholder and the transfer had that effect" it is taxable constructive dividend); *Hash v. Commissioner*, 273 F.2d 248, 250 (4th Cir. 1959) (noting that cancellation of shareholder debt to corporation constitutes taxable constructive dividend). The question of whether WVI's payment of the challenged travel expenses were constructive dividends paid by WVI to Dr. Gow is also of a factual nature, and the Tax Court's finding in that regard may be set aside only if it is clearly erroneous. *See Zfass*, 118 F.3d at 188.

There was ample evidence presented at trial in support of the Tax Court's determination that the Gows' travel expenses constituted constructive dividends. WVI funded, in their entirety, the Gows' many lavish trips to resorts in Hawaii and Florida. Indeed, each of these excursions was taken around the Thanksgiving, Christmas, or New Year's holidays. While the Gows contend that these trips were for research purposes, they made no written reports of their research. Moreover, they offered no convincing explanation of why or how WVI, as part owner of a resort in Williamsburg, Virginia, might benefit from their "research" at resorts thousands of miles away. In these circumstances, we are unable to see the Tax Court's findings on the issue of the Gows' vacation trips as clearly erroneous.

## IV.

Pursuant to the foregoing, we find no error in the Tax Court's decision. We are therefore content to adopt its well-reasoned Opinion, and we affirm. *Gow v. Commissioner*, 79 T.C.M. (CCH) 1680 (2000).

*AFFIRMED*