T.C. Memo. 2008-128

UNITED STATES TAX COURT

JANE Z. ASTLEFORD, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4342-06.                    Filed May 5, 2008.

Sue Ann Nelson and Robert J. Stuart, for petitioner.

Trent D. Usitalo and David Zoss, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined deficiencies of
$127,619 and $3,997,288 in petitioner's 1996 and 1997 respective
Federal gift taxes.

After settlement by the parties of the valuation of a number
of properties, in order to calculate the fair market value of
limited partnership interests petitioner transferred as gifts in

1996 and 1997, we must determine the fair market value of 1,187 acres of Minnesota farmland, whether a particular interest in a general partnership should be valued as a partnership interest or as an assignee interest, and the lack of control and lack of marketability discounts that should apply to the limited and to the general partnership interests.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the 2 years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner resided in Minnesota.

Petitioner's husband, M.G. Astleford (MG), was a successful real estate businessman who over the course of years acquired individually, jointly with petitioner, and through various trusts and limited and general partnerships significant interests in real estate located primarily in Minnesota. Below, we briefly describe the interests in real estate MG and petitioner owned and that petitioner transferred to a family limited partnership and the gifts of interests in the family limited partnership that petitioner in 1996 and in 1997 made to her children.

In 1970, MG and Richard T. Burger formed Pine Bend Development Co. (Pine Bend) as a Minnesota general partnership. MG and Mr. Burger were each 50-percent general partners in Pine Bend.  Under provisions of the Pine Bend general partnership agreement, consent of each partner was required with respect to the management, conduct, and operation of the partnership business in all respects and in all matters.  The Pine Bend general partnership agreement did not contain any provisions relating to the transfers of interests in Pine Bend and whether such transferred interests would be general partnership or assignee interests.

In 1970, Pine Bend purchased 3,000 acres of land near St. Paul, Minnesota, of which 1,187 acres consisted of agricultural farmland in Rosemount, Minnesota (the Rosemount property).  Pine Bend leased 944 acres of the Rosemount property to farmers and leased out the remaining acreage for use as a commercial paintball field.

The Rosemount property was located near an industrial area and an oil refinery and approximately 6 miles from the nearest residential neighborhood.  The Rosemount property was not connected to municipal sewer or water.

On or about February 20, 1992, MG and petitioner each created separate revocable trusts, and they each transferred to their separate trusts various interests in real estate.

On April 1, 1995, MG passed away.  As of the date of his death, MG owned directly (or indirectly through various partnerships and his above revocable trust) interests in 41 real properties located in Minnesota and California.  All of MG's real estate interests passed under MG's last will and testament to the M.G. Astleford Marital Trust (the marital trust), which on MG's death came into existence under MG's will for the benefit of petitioner.

After MG's death in 1995, petitioner owned (indirectly through the marital trust) all of the interests in the various real properties that MG had acquired over the years, and petitioner continued to own all of the real estate interests she separately had acquired.

On August 1, 1996, petitioner formed the Astleford Family Limited Partnership (AFLP) as a Minnesota limited partnership to facilitate the continued ownership, development, and management of the various real estate investments and partnership interests petitioner then owned and to facilitate the gifts which petitioner intended to give to her three adult children.

Under provisions of the AFLP agreement, AFLP's net cashflow was to be distributed annually among the partners.  The limited partners were not entitled to vote on matters relating to management of AFLP, no outside party could become a partner in AFLP without consent of petitioner as general partner, a limited

partner could not sell or transfer any part of his or her AFLP limited partnership interest without consent of petitioner, and no real property interest held by AFLP could be partitioned without consent of petitioner.

On August 1, 1996, petitioner funded AFLP by transferring her ownership interest in an elder-care assisted living facility with a stipulated value of $870,904.

Also on August 1, 1996, petitioner gave each of her three children a 30-percent limited partnership interest in AFLP, retaining for herself a 10-percent AFLP general partnership interest.

A November 2, 1997, partnership resolution of AFLP referred to an impending transfer to AFLP of petitioner's 50-percent Pine Bend interest as a transfer of petitioner's "entire right and interest" in Pine Bend.

On December 1, 1997, as an additional capital contribution to AFLP, petitioner transferred to AFLP her 50-percent Pine Bend interest and her ownership interest in 14 other real estate properties located in the Minneapolis-St. Paul metropolitan area (the other properties).

As a result of the December 1, 1997, transfer to AFLP of petitioner's 50-percent Pine Bend interest and of the other properties, petitioner's general partnership interest in AFLP

increased significantly, and petitioner's children's respective limited partnership interests in AFLP decreased significantly.

However, also on December 1, 1997, and simultaneously with petitioner's above transfer of property to AFLP, petitioner gave each of her three children additional limited partnership interests in AFLP having the effect of reducing petitioner's AFLP general partnership interest back down to approximately 10 percent and increasing petitioner's children's AFLP limited partnership interests back up to approximately 30 percent apiece.

In 1996 and in 1997, petitioner's three children did not make any contributions to the capital of AFLP.

On audit, as compared to the values and discounts used by petitioner in calculating and reporting on her 1996 and 1997 Federal gift tax returns the value of the gifts of AFLP limited partnership interests to her three children, respondent increased the fair market values of a number of the properties that were transferred to AFLP and the fair market value of AFLP's net asset value (NAV). Respondent decreased the lack of control and lack of marketability discounts applicable to the valuation of the gifted AFLP limited partnership interests. The schedule below reflects the total value of petitioner's taxable gifts and gift tax liabilities for 1996 and 1997, as reported on petitioner's Federal gift tax returns and as determined by respondent on audit:

|  | Petitioner's Gift Tax Returns | | Respondent's Audit Determinations | |
|------|-----------|-----------|-----------|-----------|
| Year | Taxable Gifts | Gift Tax Liability | Taxable Gifts | Gift Tax Liability |
| 1996 | $ 277,441 | $ 79,581 | $ 626,898 | $ 127,619 |
| 1997 | 3,954,506 | 2,005,689 | 10,937,268 | 3,997,288 |

OPINION

Under section 2501(a)(1) the transfer of property by gift is subject to Federal gift taxes. The amount of the gift is equal to the fair market value of the gifted property, defined as the price at which, on the date of the gift, the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 2512(a); sec. 25.2512-1, Gift Tax Regs.; see also Rev. Rul. 59-60, 1959-1 C.B. 237.

A willing buyer and a willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee of the property in question. Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

The valuation of property is a question of fact, and all relevant facts and circumstances are to be considered. Polack v.

Commissioner, 366 F.3d 608, 613 (8th Cir. 2004), affg. T.C. Memo. 2002-145.

In deciding valuation issues, courts often receive into evidence and consider the opinions of expert witnesses. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938). We may largely accept the opinion of one expert over the opinion of another expert, see Buffalo Tool & Die Mfg. Co., Inc. v. Commissioner, 74 T.C. 441, 452 (1980), and we may be selective in determining which portion of an expert's opinion to accept, Parker v. Commissioner, 86 T.C.547, 562 (1986).

The fair market values of the Rosemount property, the 50-percent Pine Bend interest, and the other properties--that petitioner on August 1, 1996, and on December 1, 1997, directly or indirectly transferred as additional capital contributions to AFLP--obviously increased the fair market value of the three AFLP limited partnership interests that petitioner simultaneously transferred to her children. As stated, of these underlying properties transferred to AFLP, the parties herein dispute only the value of the Rosemount property, whether the 50-percent Pine Bend interest should be valued as a general partnership interest or as an assignee interest, and the lack of control and lack of marketability discounts that should apply to the 50-percent Pine Bend interest and to the gifted AFLP limited partnership interests.

The Rosemount Property

On the basis of the average size of a farm in Minnesota (namely 160 acres or a one quarter section), petitioner's expert[1] treated the 1,187-acre Rosemount property owned by Pine Bend as extraordinarily large and unique and used the market data approach in his valuation, with a downward adjustment for an absorption discount.

Petitioner's expert identified as comparables to the Rosemount property 18 farm properties that had been sold. He adjusted the 18 properties for differences from the Rosemount property based on date of sale, location, and size, and he calculated an initial value for the Rosemount property of $3,100 per acre, or a total of $3,681,000. Petitioner's expert's absorption discount decreased the value to $1,817 per acre, or a total fair market value of $2,160,000.

Petitioner's expert's absorption discount was based on his opinion that a sale of the entire Rosemount property would flood the local market for farmland and would reduce the per-acre price at which the Rosemount property could be sold. Believing that the Rosemount property would sell over the course of 4 years and would appreciate 7 percent each year, petitioner's expert

---

[1] At trial, petitioner had four experts, and respondent had two experts. Throughout our opinion, we simply reference "petitioner's expert" and "respondent's expert" without further identification.

performed a cashflow analysis using a present value discount rate of 25 percent.[2]

Respondent's expert, in valuing the Rosemount property, also used the market data approach and reviewed the sale of approximately 125 Minnesota farmland properties.  He personally viewed and visited 12 of the properties.  Ultimately, respondent's expert chose two of the properties he considered comparable to the Rosemount property, and he made adjustments to his two comparables based on date of sale, and he arrived at a per-acre value for the Rosemount property of $3,500, or a total fair market value of $4,156,000.

Respondent's expert did not believe other adjustments and discounts were necessary because of the similarity of his two comparables to the Rosemount property.  Respondent's expert also concluded that because in 1970 3,000 acres of land (including the Rosemount property) had been purchased by Pine Bend in a single transaction, the entire Rosemount property likely could be sold in a single year without an absorption discount.  Respondent's expert also concluded that even if an absorption discount was appropriate, petitioner's 25-percent present value discount rate was excessive.  Respondent argued that the present value discount rate should track the rate of return on equity which farmers in

---

[2] Petitioner's expert also reduced projected annual cashflow by estimated sales expenses and costs of 7.25 percent and by property taxes of approximately .6 percent.

Dakota County, Minnesota, actually earned, and respondent's expert referenced a report of the Southeastern Minnesota Farm Business Management Association indicating that in 1997 the average rate of return on equity for farmers in southeastern Minnesota was 9.2 percent.

Respondent's expert was particularly credible and highly experienced and possessed a unique knowledge of property located throughout Dakota County and the surrounding area, and we conclude that respondent's expert's initial value of $3,500 per acre for the Rosemount property is correct. However, we believe that due to the size of the Rosemount property in relation to the number of acres sold each year in Dakota County, it is unlikely that all 1,187 acres of the Rosemount property would be sold in a single year without a price discount.

In other valuation cases we have allowed a market absorption discount based on the understanding that a sale of a large parcel of real estate over a short period of time tends to reduce the price for which real estate otherwise would sell. See Estate of Rodgers v. Commissioner, T.C. Memo. 1999-129; Carr v. Commissioner, T.C. Memo. 1985-19; Estate of Grootemaat v. Commissioner, T.C. Memo. 1979-49.

We, however, regard petitioner's present value discount rate of 25 percent as unreasonably high because it relies on statistics relating to developers of real estate who expect

greater returns given greater risks.  A present value discount rate is a function of the riskiness of a project, and the hypothetical project herein is not land development but the sale of farmland over 4 years.

Over 75 percent of the Rosemount property was leased to farmers providing a source of future income to a prospective purchaser.  Given the low level of risk, a rate of return that likely would induce a purchase of the Rosemount property would be more akin to the return on equity which farmers in the area were actually earning--namely, 9.2 percent.  See IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 531 (1991) (rate of return on equity used as an appropriate present value discount rate).

Given the minimal risk involved in selling the Rosemount property over 4 years, the fact that most of the acreage was already leased, and the 9.2-percent return on equity earned by southeastern Minnesota farmers in 1997, we conclude that the appropriate present value discount rate to apply to the projected cashflow from the Rosemount property over 4 years is 10 percent. Using an initial per-acre value of $3,500, and substituting a present value discount rate of 10 percent, the fair market value of the Rosemount property, taking into account market absorption over 4 years, is $2,786.14 per acre or a total fair market value

of \$3,308,575.[3]  In the summary schedule below (using rounded numbers), we compare the parties' calculations with our calculation for the fair market value of the Rosemount property:

| Rosemount Property* | Petitioner's Expert | Respondent's Expert | Our Calculation |
|---|---|---|---|
| Per acre value before absorption discount | $ 3,100 | $ 3,500 | $ 3,500 |
| Value of 1,187.51 acres before absorption discount | 3,681,000 | 4,156,000 | 4,156,000 |
| Per acre value after absorption discount | 1,817 | 3,500 | 2,786.14 |
| Total value of 1,187.51 acres after absorption discount | 2,160,000 | 4,156,000 | 3,308,575 |

> \*  We use actual acreage for the Rosemount property of 1,187.51 acres.

Treatment of 50-Percent Pine Bend Interest

The valuation dispute relating to Pine Bend involves the treatment or the nature, for gift tax valuation purposes, of the 50-percent Pine Bend interest that petitioner transferred to AFLP (i.e., whether it should be treated as a general partnership interest or merely as an assignee interest) and the lack of control and lack of marketability discounts that should apply to the 50-percent Pine Bend interest.

---

[3] Like petitioner's expert, we assume 7-percent annual appreciation and reduce projected cashflow by estimated sales expenses and property taxes of 7.25 percent and .6 percent, respectively.

Petitioner treats the 50-percent Pine Bend interest transferred to AFLP as an assignee interest and discounts that interest by 5 percent because under Minnesota law a holder of an assignee interest would have an interest only in the profits of Pine Bend and would have no influence on management. See Minn. Stat. sec. 323.26 (1996), repealed by Minn. Stat. ch. 323A (enacted 1997 and renumbered Supp. 2008).

Petitioner's argument that under Minnesota law the 50-percent Pine Bend interest should be treated as an assignee interest is based primarily on Minnesota law and trial evidence suggesting that Mr. Burger, the other 50-percent Pine Bend general partner, did not consent to petitioner's December 1, 1997, transfer to AFLP of petitioner's Pine Bend interest. See Minn. Stat. sec. 323.26.

Respondent argues that the substance over form doctrine should apply and that thereunder the Pine Bend interest petitioner transferred to AFLP should be treated as a general partnership interest. We agree with respondent and so hold.[4]

---

[4] Alternatively, respondent argues that if the 50-percent Pine Bend interest is to be treated as an assignee interest, petitioner's voting and liquidation rights in the transferred Pine Bend interest would have lapsed on the date of petitioner's transfer thereof, and under sec. 2704(a) the lapse would trigger an additional deemed taxable gift by petitioner of those rights-- effectively recapturing for Federal gift tax purposes the value of the voting and liquidation rights (i.e., the difference in value between a Pine Bend general partnership interest and a Pine Bend assignee interest). Because of our resolution as to the substance of the transferred 50-percent Pine Bend interest, we

(continued...)

The Federal tax effect of a particular transaction is governed by the substance of the transaction rather than by its form. In <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 573 (1978), the Supreme Court explained this substance over form doctrine as follows:

> In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," <u>Commissioner v. Tower</u>, 327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." <u>Helvering v. Lazarus & Co.</u>, 308 U.S. [252, 255 (1939).] * * *

The substance over form doctrine has been applied to Federal gift and estate taxes. See <u>Heyen v. United States</u>, 945 F.2d 359, 363 (10th Cir. 1991); <u>Estate of Murphy v. Commissioner</u>, T.C. Memo. 1990-472. In particular, we have applied the substance over form doctrine in valuation cases to treat transfers of alleged assignee interests as, in substance, transfers of partnership interests. See <u>Kerr v. Commissioner</u>, 113 T.C. 449, 464-68 (1999), affd. on another issue 292 F.3d 490 (5th Cir. 2002).

---

[4](...continued)
need not address respondent's alternative argument under sec. 2704(a).

The facts in this case establish that in substance the Pine Bend interest transferred by petitioner to AFLP should be treated as a general partnership interest, not as a Pine Bend assignee interest. Because petitioner was AFLP's sole general partner, petitioner was essentially in the same management position relative to the 50-percent Pine Bend interest whether she is to be viewed as having transferred to AFLP a Pine Bend assignee interest (and thereby retaining Pine Bend management rights) or as having transferred those management rights to AFLP via the transfer of a Pine Bend general partnership interest (in which case she reacquired those same management rights as sole general partner of AFLP). Either way, after December 1, 1997, petitioner continued to have and to control the management rights associated with the 50-percent Pine Bend general partnership interest.

We note that the November 2, 1997, AFLP partnership resolution treats petitioner's Pine Bend transfer as a transfer of all of petitioner's rights and interests in Pine Bend, suggesting the transfer of a general partnership interest, not the transfer of an assignee interest. See Estate of Jones v. Commissioner, 116 T.C. 121, 133 (2001) (interests not assignee interests where documents referred to interests as "partnership" interests); Kerr v. Commissioner, supra at 466-467 (interests not assignee interests where language used to document transfers demonstrated "partnership" interests were transferred); Estate of

Dailey v. Commissioner, T.C. Memo. 2001-263 (interests not assignee interests where documents referred to "partnership" interests); cf. Estate of Nowell v. Commissioner, T.C. Memo. 1999-15 (interests assignee interests where documents did not indicate partnership interests were transferred).

## Discounts Applicable to Pine Bend and to AFLP Interests

For purposes of calculating lack of control and lack of marketability discounts that should apply to the 50-percent Pine Bend general partnership interest petitioner transferred to AFLP on December 1, 1997, and to the AFLP limited partnership interests petitioner gave to her children on August 1, 1996, and December 1, 1997, petitioner's expert relied on comparability data from sales of registered real estate limited partnerships or RELPs. Respondent's expert relied on comparability data from sales of publicly traded real estate investment trusts or REITs.

We decline to declare either RELP or REIT data generally superior to the other. We note that courts have accepted expert valuations using both RELP and REIT data. For example, RELP data were used in Estate of Weinberg v. Commissioner, T.C. Memo. 2000-51, and Temple v. United States, 423 F. Supp. 2d 605, 619 (E.D. Tex. 2006); REIT data were used in Lappo v. Commissioner, T.C. Memo. 2003-258, and Estate of McCormick v. Commissioner, T.C. Memo. 1995-371.

We believe that when considering the size, marketability, management, distribution requirements, and taxation of RELPs and REITs, RELPs more closely resemble AFLP and Pine Bend, and we believe that the low trading volume on the RELP secondary market is not so low as to render available RELP data unreliable.

We also believe, however, that the large number of REIT sales transactions tends to produce more reliable data compared to the limited number of RELP sales transactions. We believe further that differences between REITS, on the one hand, and Pine Bend and AFLP, on the other, may be minimized given the large number of REITs from which to choose comparables.

With regard to the lack of control and lack of marketability discounts applicable to the 50-percent Pine Bend general partnership interest which petitioner on December 1, 1997, transferred to AFLP, petitioner's expert identified trading discounts (i.e., differences between unit or share trading prices and unit or share NAVs) observed in 17 RELP comparables trading on the RELP secondary market, and he equated those trading discounts with a combined discount for lack of control and lack of marketability. Petitioner's expert derived therefrom what he believed should be the lower and upper limits to his combined discount--a floor of 22 percent and a ceiling of 46 percent--but he then abruptly concluded that a combined 40-percent discount for lack of control and lack of marketability should apply

without explaining further how he picked 40 percent as opposed to 22 or 46 percent, or some other number within his range.

In valuing the 50-percent Pine Bend general partnership interest, respondent's expert concluded that because the Pine Bend partnership interest was simply an asset of AFLP, discounts he applied at the AFLP level, see infra pp. 22-24, obviated the need to apply an additional and separate discount at the Pine Bend level.[5]

With regard to petitioner's expert's 17 RELP comparables we eliminate 4 of the RELP comparables because their data was based on information from 1999, not from 1997. Median and mean trading discounts of approximately 30 and 36 percent were observed in the

---

[5] We note that this Court, as well as respondent, has applied two layers of lack of control and lack of marketability discounts where a taxpayer held a minority interest in an entity that in turn held a minority interest in another entity. See Estate of Piper v. Commissioner, 72 T.C. 1062, 1085 (1979); Janda v. Commissioner, T.C. Memo. 2001-24; Gow v. Commissioner, T.C. Memo. 2000-93, affd. 19 Fed. Appx. 90 (4th Cir. 2001); Gallun v. Commissioner, T.C. Memo. 1974-284. However, we also have rejected multiple discounts to tiered entities where the lower level interest constituted a significant portion of the parent entity's assets, see Martin v. Commissioner, T.C. Memo. 1985-424 (minority interests in subsidiaries comprised 75 percent of parent entity's assets), or where the lower level interest was the parent entity's "principal operating subsidiary", see Estate of O'Connell v. Commissioner, T.C. Memo. 1978-191, affd. on this point, revd. on other issues 640 F.2d 249 (9th Cir. 1981).

The 50-percent Pine Bend interest constituted less than 16 percent of AFLP's NAV and was only 1 of 15 real estate investments that on Dec. 1, 1997, were held by AFLP, and lack of control and lack of marketability discounts at both the Pine Bend level and the AFLP parent level are appropriate.

remaining RELP comparables.  In light of these median and mean trading discounts and in light of 28.7 percent and 30 percent median and mean trading discounts observed in a total sample of 130 RELPs in 1997, we conclude that a combined discount of 30 percent for lack of control and lack of marketability is appropriate for the 50-percent Pine Bend interest that petitioner on December 1, 1997, transferred to AFLP.  We conclude that as of December 1, 1997, the fair market value of the 50-percent Pine Bend general partnership interest petitioner transferred to AFLP is $1,299,107, computed as follows:

```
Pine Bend assets
    Cash                                    $   213,159
    Rosemount Property                        3,308,575
    Stipulated NAV of other property            190,000

Total NAV of Pine Bend                      $3,711,734
    Less 30-percent combined
      discount for lack of control
      and marketability                     (1,113,520)

Total discounted Pine Bend NAV              $2,598,214

12/1/1997 FMV of 50-percent Pine Bend
  general partnership interest              $1,299,107
```

To establish just the lack of control discount applicable to the AFLP limited partnership interests as of the dates of petitioner's gifts thereof to her three children--August 1, 1996, and December 1, 1997--petitioner's expert used trading discounts observed in RELP units traded in the RELP secondary market. Taking into account AFLP's financial situation, petitioner's

expert selected nine specific RELPs to serve as comparables to AFLP.

Petitioner's expert's RELP comparables were significantly more leveraged than AFLP (from 82 percent to 205 percent of debt to NAV compared to AFLP's more moderate leverage in 1997 of 52 percent of debt to NAV), and petitioner's expert's RELP comparables had an average trading discount of 38 percent.

From his initial nine RELP comparables, petitioner's expert selected four RELP comparables he considered most comparable to AFLP, which had trading discounts ranging from 40 percent to 47 percent, and petitioner's expert chose a lack of control discount for the gifted AFLP interests of 45 percent for 1996 and 40 percent for 1997.[6]

Of petitioner's expert's four specific RELP comparables, two had NAVs approximately five times the NAV of AFLP and his other two RELP comparables were even more leveraged. Where the comparables are relatively few in number, we look for a greater similarity between comparables and the subject property. Cf. Estate of Heck v. Commissioner, T.C. Memo. 2002-34 ("As similarity to * * * [a] company to be valued decreases, the number of required comparables increases").

---

[6] For convenience, we occasionally reference "1996" and "1997" without specifying the exact valuation dates--namely, Aug. 1, 1996, and Dec. 1, 1997.

Because AFLP held less debt and was, according to petitioner's expert, inherently less risky than his comparables, we find it unlikely that the proper lack of control discount to apply to AFLP should be as high as the 45-percent and 40-percent discounts used by petitioner's expert for the respective 1996 and 1997 gifted AFLP limited partnership interests.

Petitioner's expert also stated that the higher an RELP's cash distribution rate the lower the investor risk should be, which in turn would suggest a lower trading discount. Because AFLP's cash distribution rate of 10 percent was significantly higher than the 6.7-percent average cash distribution rate observed in his RELP comparables, under petitioner's expert's own approach his recommended AFLP lack of control discounts should be lower than the 38-percent average trading discount he observed in his RELP comparables.

We conclude that the RELP comparables petitioner's expert used are too dissimilar to AFLP to warrant the amount of reliance petitioner's expert placed on them, and we conclude that petitioner's lack of control discounts for the gifted AFLP limited partnership interests of 45 percent for 1996 and 40 percent for 1997 are excessive.

Rather than sifting through RELP data looking for more appropriate RELPs to serve as comparables in an effort to estimate lack of control discounts for the gifted AFLP limited

partnership interests, we use REIT data used by respondent's expert with adjustments to his methodology.

From an investment advisory firm respondent's expert obtained trading prices and share NAVs for approximately 75 REITs.  The REIT data showed that in 1996 in the public marketplace REITs traded at a median .1-percent premium over per-share NAV and in 1997 at a median 1.2-percent discount under per-share NAV.

Because REITs allow investors to own a minority but at the same time a liquid investment in an otherwise nonliquid asset (i.e., real estate), investors in REITs are willing to pay a liquidity premium (relative to per-share NAV) to invest in REIT shares.  As explained in McCord v. Commissioner, 120 T.C. 358, 385 (2003), revd. and remanded on other grounds 461 F.3d 614 (5th Cir. 2006), this does not mean that a lack of control discount is nonexistent but suggests that an REIT's share price is in part affected by two factors, one positive (the liquidity premium) and one negative (lack of control).  Thus, in analyzing REIT comparables and their trading prices, it is appropriate to identify and to quantify, and then to reverse out of the trading prices, any liquidity premiums that are associated with REIT comparability data, which calculation results in an REIT discount for lack of control that can be applied to the subject property.

On the basis of a regression analysis, respondent's expert concluded that for 1996 and 1997 REITs traded generally at a liquidity premium of 7.79 percent over illiquid investments such as closely held partnership interests.

To eliminate the effect of this 7.79-percent liquidity premium on REIT trading share prices respondent's expert made a mathematical calculation that for 1996 combined this 7.79-percent liquidity premium with the observed 1996 .1-percent REIT median trading premium and the observed 1997 1.2-percent REIT median trading discount, and he arrived at a lack of control discount to apply to the gifted AFLP limited partnership interests of 7.14 percent for 1996[7] and 8.34 percent for 1997.[8]

We agree with respondent's expert that in order to estimate or quantify an appropriate lack of control discount from REIT trading prices one should eliminate or reverse out the liquidity premium inherent in REIT trading prices. However, respondent's expert's 7.79-percent liquidity premium appears unreasonably low. Our concern rests partly on the fact that other studies cited by respondent's expert suggest that liquidity premiums applicable to publicly traded investments are nearly double that used by respondent's expert and partly on the fact that respondent's expert's 7.79-percent liquidity premium resulted in a discount

---

[7] $1-[1+.001]/[1+.0779]=.0714$.

[8] $1-[1-.012]/[1+.0779]=.0834$.

for lack of control that, on its face, appears unreasonably low (namely, his lack of control discounts of 7.14 percent for 1996 and 8.34 percent for 1997).  See Lappo v. Commissioner, T.C. Memo. 2003-258 (respondent's expert's calculation of a liquidity premium rejected for similar reasons).

To combine or to calculate a liquidity premium (to use in this case for 1996 and 1997 and to reverse out of REIT trading prices to isolate or to quantify an appropriate lack of control discount), we look simply to the difference in average discounts observed in the private placements of registered and unregistered stock based on the premise that the difference so observed represents pure liquidity concerns, since a ready, public market is available to owners of registered stock but is unavailable to owners of unregistered stock.  See McCord v. Commissioner, supra at 385; Lappo v. Commissioner, supra.  According to two studies respondent's expert cited, the difference was approximately 14 percentage points, which results in a general liquidity premium inherent in publicly traded assets of 16.27 percent[9] that would also be applicable to publicly traded REITs.

To calculate the lack of control discount present in the REIT comparables we must eliminate (from the .1-percent median

---

[9] If an illiquid asset trades at a discount of 14 percent relative to a liquid asset, the liquid asset is trading at a premium of 16.27 percent from the illiquid asset (namely, $1/[1-.14]-1=.1627$).

trading premium observed for the 1996 REIT comparables and the 1.2-percent median trading discount observed for the 1997 REIT comparables) this 16.27-percent liquidity premium. For 1996, we simply subtract .1 percent from the 16.27-percent liquidity premium to arrive at a lack of control discount of 16.17 percent.[10] For 1997, we simply add 1.2 percent to the 16.27-percent liquidity premium to arrive at a lack of control discount of 17.47 percent[11].[12]

For a lack of marketability discount applicable to the three 30-percent AFLP limited partnership interests petitioner gave to her children on August 1, 1996, petitioner's expert estimated a discount of 15 percent, and respondent's expert estimated a discount of 21.23 percent. We perceive no reason not to use

---

[10] .1627-.001=.1617.

[11] .1627+.012=.1747.

[12] Without explanation, to arrive at his lack of control discounts for 1996 and 1997, when combining his liquidity premium with the REIT trading premium and/or discount, respondent's expert used a different mathematical calculation than the one he used in McCord v. Commissioner, 120 T.C. 358, 385 (2003), revd. and remanded on other grounds 461 F.3d 614 (5th Cir. 2006). We use the calculation respondent's expert used in McCord because of its simplicity and intuitiveness. We note that use of the particular mathematical calculation respondent's expert used herein would produce lack of control discounts of approximately 14 percent for 1996 (1-[1+.001]/[1+.1627]=.14) and 15 percent for 1997 (1-[1-.012]/[1+.1627]=.15), relatively close to our lack of control discounts of 16.17 percent and 17.47 percent, respectively.

respondent's higher marketability discount of 21.23 percent without further discussion, which we do.

For the three AFLP limited partnership interests petitioner gave her children on December 1, 1997, because both parties advocate a lack of marketability discount of approximately 22 percent, we apply a lack of marketability discount of 22 percent.

Conclusion

We conclude that the fair market value of each of the three 30-percent AFLP limited partnership interests petitioner gave on August 1, 1996, was $172,525, (for total taxable gifts in 1996 of $517,575) and that the fair market value of each of the three AFLP limited partnership interests petitioner gave on December 1, 1997, was $2,188,405 (for total taxable gifts in 1997 of $6,565,215), calculated as follows:

1996 Gifts

| | |
|---|---|
| Total stipulated AFLP NAV of elder-care facility as of 8/01/96 | $870,904 |
| Less Discounts for AFLP limited partnership interests | |
| 16.17-percent lack of control | (140,825) |
| | $730,079 |
| 21.23-percent lack of marketability | (154,996) |
| | $575,083 |
| FMV of each gifted 30-percent interest | $172,525 |
| Total value of gifted AFLP interests | $517,575* |

      * 3 x $172,525 = $517,575.

<u>1997 Gifts</u>

| | |
|---|---|
| 12/1/1997 NAV of properties and interests transferred to AFLP | |
|     50-percent Pine Bend interest | $ 1,299,107 |
|     Stipulated NAV of other properties | 10,032,721 |
| | $11,331,828 |
|     Less Discounts for AFLP limited partnership interests | |
|         17.47-percent lack of control | (1,979,670) |
| | $9,352,158 |
|       22-percent lack of marketability | (2,057,475) |
| | $7,294,683 |
| FMV of each gifted 30-percent interest | $2,188,405 |
| Total value of gifted AFLP interests | $6,565,215* |

\* 3 x $2,188,405 = $6,565,215.

This case is decided on the preponderance of the evidence and is unaffected by section 7491.  See <u>Estate of Bongard v. Commissioner</u>, 124 T.C. 95, 111 (2005).[13]

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[13] Because of the way AFLP's capital accounts were maintained, petitioner argues that on Dec. 1, 1997, she transferred to each of her three children a 27.9-percent limited partnership interest in AFLP.  Regardless of the exact percentage interest in AFLP which petitioner transferred to her children (27.9 percent or 30 percent), the value of each of the three gifted interests is equal to 30 percent of the NAV of the properties and Pine Bend partnership interest petitioner transferred to AFLP on Dec. 1, 1997.